JAMES GARRISON, ESQ. (SBN: 224401)

  *garrison61@hotmail.com*

324 Maple Ridge Drive

Big Bear City, CA 92314

Attorney for Plaintiff

NORTH AMERICAN WELLNESS CENTER HOLDINGS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH AMERICAN WELLNESS CENTER HOLDINGS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> TEMECULA VALLEY REAL ESTATE, INC., D/B/A KW COMMERCIAL, KELLER WILLIAMS REALTY, INC., KEVIN VERNON, ANDREW SMITH and THE VERNON GROUP, LLC <br><br> Defendants. | **CASE NO.: 5:16-cv-02010** <br><br> **COMPLAINT FOR:** <br><br> 1. **VIOLATION OF THE SHERMAN ACT SECTION 1** <br> 2. **VIOLATION OF THE SHERMAN ACT SECTION 2** <br> 3. **CALIFORNIA CARTWRIGHT ACT; BUSINESS AND PROFESSIONS CODE SECTIONS 16700:16770** <br> 4. **SECURITIES VIOLATIONS; 15 U.S.C. SECTION 78j** <br> 5. **SECURITIES VIOLATIONS; 15 U.S.C. SECTION: 10B AND RULE 10B-5** <br> 6. **SECURITIES VIOLATION OF SECTION 9(A)(4) OF THE EXCHANGE ACT** <br> 7. **CALIFORNIA CORPORATIONS CODE SECTION 25401** <br> 8. **TRANSACTION, PRACTICE OR COURSE OF BUSINESS TO DEFRAUD BY INVESTMENT ADVISOR:** |

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

          CALIFORNIA
CORPORATIONS CODE
SECTION 25235
9. UNTRUE AND MISLEADING
STATEMENTS; CALIFORNIA
BUSINESS AND
PROFESSIONS CODE
SECTION 17500
10.UNFAIR COMPETITION;
CALIFORNIA BUSINESS AND
PROFESSIONS CODE
SECTION 17200
11.VIOLATION OF
REGISTRATION
REQUIREMENTS OF
CALIFORNIA SECURITIES
LAWS AGAINST ALL
DEFENDANTS
12.VIOLATION OF CIVIL CODE
SECTION 3372:
DEFENDANTS FAILED TO
EXERCISE DUE CARE IN
RENDERING SERVICES TO
PLAINTIFF
13.AIDING AND ABETTING
UNLICENSED PERSON OR
UNREGISTERED COMPANY
TO EVADE LAW;
CALIFORNIA
CORPORATIONS CODE
SECTION 8639
14.FRAUD, DECEIT AND
CONCEALMENT (AS
REGARDS TO DEFENDANTS
SMITH AND VERNON)
15.AIDING AND ABETTING
FRAUD
16.MISREPRESENTATION,
INTENTIONAL AND

**NEGLIGENT MISREPRESENTATION**
17. **AIDING AND ABETTING MISREPRESENTATION**
18. **BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY**
19. **NEGLIGENCE**
20. **REGISTERED INVESTMENT ADVISERS STATUTORY FRAMEWORK AND REGULATORY SCHEME CALIFORNIA CORPORATIONS CODE SECTIONS 25200-25209 AND 25230-25238**

## THE PARTIES

1.     Plaintiff North American Wellness Center Holdings, LLC (the "Company," "Plaintiff," or "Buyer") is a limited liability company formed and registered in the state of Delaware. The company pays taxes in California for the sole purpose of filing and defending lawsuit filed in this case and does not have any operational activities or places of business in California.

2.     Plaintiff is informed and believes that Defendant Keller Williams Realty, Inc. ("KWR") is a domestic for-profit corporation organized and existing under the laws of the state of Texas, operating as a Real Estate Franchise company located at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746. The

1    Company is one of the largest franchise companies in the nation and franchises

2    several Real Estate companies.

3        3.    Plaintiff is informed and believes that Defendant Temecula Valley Real

4    Estate, Inc. doing business as Temecula Valley ("Temecula Valley"), is a domestic

5    for-profit corporation organized and existing under the laws of the state of

6    California, located at 27290 Madison Avenue, Suite 200, Temecula, California

7    92590 is a franchisee of KWR. Plaintiff believes that Temecula Valley is agent and

8    franchisee of KWR, and works under the operational guidelines and policy manual

9    mandates of KWR. Thus as a principal, KWR supervises and is responsible for all

10   structuring, monitoring and supervising all real estate functions and services

11   provided to the public by all such franchisees such as Temecula Valley.

12       4.    Plaintiff is informed and believes and thereon alleges that Kevin

13   Vernon, acting in his individual capacity and in capacity as member and/or manager

14   of defendant The Vernon Group, LLC (collectively, Kevin Vernon and The Vernon

15   Group, LLC, "Kevin Vernon" or "Vernon") and Andrew Smith are individuals

16   licensed as real estate sales person employed full time, by Temecula Valley, and are

17   citizens of the state of California.

18       5.    Plaintiff is informed and believes and thereon alleges that Temecula

19   Valley through its broker Kevin Vernon and Andrew Smith, provided and provides

20   real estate brokerage and advisory services such as valuation and Broker Opinion of

4
COMPLAINT

Value and Real Estate Investment Advisory Services to the public and in particular provided such services to the Plaintiff.

6.     Plaintiff is informed and believes that on or about Summer of 2012 and through period of 2012 to 2014, Defendants Andrew Smith and his employer Temecula Valley provided real estate investment advisory and capital advisory services to Plaintiff. Plaintiff is informed and believes that each of these defendants is not registered with the Securities and Exchange Commission ("SEC") as a broker-dealer or an investments adviser, and is not a member of the Financial Industry Regulatory Authority ("FINRA"). Each of these defendants is not licensed as a mortgage broker in the State of California with either the California Department of Corporations or the California Department of Real Estate. Each of these defendants is not licensed as a bank, savings and loan association, or finance company under State and Federal law.

7.     Plaintiff is informed and believes that Defendants Kevin Vernon, Andrew Smith and Does 1-10 work under their employer Temecula Valley pursuant to KWR guidelines and policies adopted by Temecula Valley, and collectively worked with each other throughout the negotiations with Plaintiff including bringing a third party Mr. Steve Witt to join the team for the purposes of offering said services (as described below) to Plaintiff.

8.     Plaintiff is informed and believes that Defendants Kevin Vernon and Andrew Smith and Mr. Steve Witt, worked together to provide services to Plaintiff including Real Estate Investment Advisory and other consulting services under the Keller William name, relating to Plaintiff's investment into the real estate development project that is subject of the dispute.

9.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendants, and each of them, were and now are the agents, servants, employees, representatives and/or alter egos of each of the remaining Defendants and, in doing the things hereinafter mentioned, were acting within the scope of their authority as such agents, servants, employees and/or representatives with the permission and consent of the remaining Defendants.

## DOE DEFENDANTS

10.     The true names and capacities, whether individual, corporate, associate or otherwise, of the Defendants sued herein as Does 1-10, inclusive, are unknown to Plaintiff, and Plaintiff therefore sues such Doe Defendants by fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when they have been ascertained. Plaintiff are informed and believe, and thereon allege, that each of the fictitiously named Doe Defendants was responsible in some manner for the occurrences herein alleged and that Plaintiffs' damages were proximately

COMPLAINT

caused by each such Doe Defendant's conduct. References to "Doe Defendants" shall mean and include those Doe Defendants sued herein by such fictitious names.

11.    Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned, Doe Defendants, and each of them, were the partners, members, servants, agents and/or employees of the other Defendants and in doing the things herein alleged were acting within the course and scope of their authority as such partners, members, agents, servants and/or employees and with permission and/or consent of their co-defendants.

12.    The Doe Defendants named herein as Does 1-10, inclusive, and each of them, are unknown to Plaintiff, who therefore sue such defendants by fictitious names. Plaintiff is informed and believes, and thereon allege, that each fictitiously named Doe Defendant is in some manner, means or degree responsible for the events and happenings herein alleged. Plaintiff will amend this complaint, as necessary, to set forth the true names and capacities of the fictitiously designated Doe Defendants when ascertained.

13.    Plaintiff is informed and believes, and thereon alleges, that Does 1-10, inclusive, are individuals, professionals, advisors, law firms and/or other entities who conspired with, and/or materially aided and abetted, defendants in devising, planning, orchestrating and/or carrying out one or more of their joint acts related to and supporting the claims herein, which acts are more particularly described below.

14.     In the event future discovery establishes that one or more Defendants including lawyers or law firms conspired with and/or aided or abetted the defendants and therefore should be named in the place of any of the foregoing Doe Defendants, then to the extent applicable, if at all, Plaintiff will comply with his/her/its/their obligations to bring those Defendants within the jurisdiction of the Court.

**VENUE AND JURISDICTION**

15.     This Court has jurisdiction over this action under 28 U.S.C. section 1332 (a) and (b) which provides federal courts original jurisdiction over cases where diversity of citizenship exists and the amount of the controversy exceeds seventy-five thousand dollars.

16.     This Court has jurisdiction under Title 28, Section 1331 of the United States Code and confers upon federal district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States". This Court has jurisdiction on federal claims pleaded under 15 USC section 78, 10b and 10b5 and has supplemental jurisdiction over state law and common law claims pursuant to 28 USC section 1367. Additionally, the Court has jurisdiction under Section 27 of the Securities Exchange Act of 1934 provides that federal courts "shall have exclusive jurisdiction" over "violations of [the Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any

1  liability or duty created by [the Act] or the rules and regulations thereunder." 15

2  U.S.C. § 78aa(a).

3      17.    This Court has jurisdiction pursuant to Sections 4 and 16 of the Clayton

4  Act, 15 U.S.C. section 15 and 26, to obtain injunctive relief and to recover damages,

5  including treble damages, costs of suit, and reasonable attorney's fees against

6  Defendants for injuries sustained by Plaintiff as a result of violations of Sections 1

7  and 2 of the Sherman Act, 15 U.S.C. sections 1 and 2 as alleged herein. Plaintiff also

8  brings this action under 28 U.S.C. section 1337 (a), commerce and antitrust clause,

9  28 U.S.C. Section 1332, to recover damages, including treble damages sustained by

10 Plaintiff as a result of violations of California Cartwright law as alleged herein.

11      18.    The Court has personal jurisdiction over Defendants as some of these

12 reside in the area and conduct business in California and District. This Court has

13 jurisdiction over the claims pursuant to California specific remedies and interest to

14 protect statewide investor activities and in regulation of securities fraud as well as

15 an interest to promote fair justice. This Court has jurisdiction over the claims as the

16 Court is able to provide the complete relief prayed for in this matter.

17      19.    Venue is proper pursuant to 28 U.S.C. section 1391 because some of

18 the Defendants are residents of the district and conduct meetings in the area and

19 because the Court has personal jurisdiction over the Defendants. Venue is also

20 proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. section 22

COMPLAINT

1    and 28 U.S.C. sections 1391(b)(c). Each defendant maintains office(s) and maintains

2    representatives and/or transacts business within this District within the meaning of

3    Section 12 of the Clayton Act, 15 U.S.C. section 22.

4         20.    Defendants, DOES 1-10, are persons or organizations having minimum

5    contacts with the State of California, including, but not limited to, the relationship

6    of the allegations contained herein to Defendant's activities and contacts in the State

7    of California, County of Riverside, render the jurisdiction and venue appropriate in

8    the district.

9         21.    No other forum would be more convenient for the parties and witness

10   to litigate this action.

11                              **INTRODUCTION**

12        22.    This case is about a Buyer (Plaintiff North American Wellness Center)

13   who on the basis of certain representations made by broker(s) of Temecula Valley

14   entered into the Real Estate Development opportunity promoted by Defendants as

15   an attractive venture whereby Plaintiff would purchase raw developable land from a

16   Seller (a Ms. Patricia Holmes) [herein referred to as "Seller"]  for an inflated price

17   allowing inflated commission on the transaction, invest in development of the land

18   and enter simultaneously into an Investment Advisory Contract allowing for inflated

19   commissions, Placement Fee and consulting fees to the brokers as described in this

20   complaint.

23.     Plaintiff, on the basis of the false representations made by brokers of the franchisee Temecula Valley, entered into the Investment opportunity by way of purchase of a certain property owned by a Ms. Patricia Holmes, the Seller. The brokers proposed and promoted the following plan: Plaintiff would Invest into developing the land by agreeing to purchase the property and investing substantial sums of moneys into Permits and Improvements on the Land then by way of entering into contract with the same brokerage company (Temecula Valley) for Capital advisory services, raise the necessary financing for the transaction. In reality the transactions were promoted as a consolidated offering promising an attractive Rate of Return on the Investment with significant returns to the Buyer (Plaintiff) within a short period of time. Additionally, the proposed and promoted scheme would result in considerable and substantial fees and commission to the brokers and to Defendants Temecula Valley and KWR.

24.     As a result of relationships cultivated with the Plaintiff, the brokers and the Brokerage Company (Temecula Valley) were able to force Plaintiff to execute 2 significant contracts: (1) the land purchase contract and (2) investment advisory services contract, all allowing significant opportunities for substantial commissions, Placement Fees and Consulting fees. The venture was sold as a development project for Senior Living and Medical Use.

25.     The brokerage firm of Temecula Valley represented the transaction, and provided four core services: (1) Acquisition Analysis including Purchase Pricing Analysis to Seller and Buyer (2) Project Feasibility and Valuation Analysis to Buyer (3) Sale of Real Estate Investment opportunity by way of land sale contract for Real estate development to Buyer and (4) Capital raising [Equity raising services] to Buyer. A complete chronology of events is provided below. The transaction entered into the parties, the Defendants was thus comprised of two main components: (1) securing Buyer's Investment into Real Estate Development opportunity by way of securing the purchase and sale of real estate parcel and then (2) securing Capital Raising Advisory contract by way of promoting the transaction as a Real Estate development project which would require raising Capital, where Defendants would provide Capital raising services for a significant Placement Fee [based on the amount of Capital to be raised and on the future resale of condominiums], Commissions and Consulting fees.  The primary scheme was to induce Buyer to invest into inflated real estate with Buyer investing substantial sums of moneys into permits and rezoning, then, procuring a contract to raise capital and sell condominium units to public, thereby arranging both commissions and consulting fees from the transaction as well as a Placement Fee for the Capital Advisory services.

26.     The purchase and sale of the real estate contract between the parties was represented by the brokerage firm of Temecula Valley who represented both

1   Buyer and Seller. Buyer entered into the contract of purchase of real estate with

2   Seller based on upon the representations made by Kevin Vernon the broker on the

3   transaction (representing both Buyer and Seller) and registered as an agent with

4   Temecula Valley. Vernon misrepresented the value of land to Buyer (as discussed

5   below) and fraudulently concealed the True valuation of land from the Buyer which

6   he provided to Seller, and induced Buyer to enter the transaction based on false

7   valuation as discussed below. Vernon also represented to Buyer that the financing

8   of the deal would be arranged by another broker within the KWR office, Mr. Andrew

9   Smith. The Development opportunity was presented to Buyer as a Real Estate

10  Investment Opportunity with an attractive investment return (as discussed below)

11  with the assurance that Capital needs for the transaction would be serviced by Smith

12  and internally by Temecula Valley whereby Buyer would need to execute the Capital

13  Advisory contract simultaneously with the land purchase contract. Smith and

14  Vernon then represented in order that Buyer develop the property Smith's services

15  would be needed to successfully develop the purchased property. Smith and

16  Vernon's Capital Advisory contract was then based on Vernon's inflated valuation

17  of the Real Estate securing inflated Fees and Commissions on the consolidated

18  offering (the land purchase and the capital advisory agreements).  Buyer was told by

19  Vernon that Smith would assist in raising capital based on KWR network of capital

20  relationships and that of Smith's own capital resources and network connections.

1   Smith then represented that he was locally well networked with developers and

2   sources of Capital to allow for raising Capital.  Buyer believed these representations

3   and invested substantial sums of moneys into the project, when Buyer had completed

4   all permit improvements Seller sent a notice of termination to Buyer.

5       27.     To accommodate Buyer's intended use other development Buyer was

6   also advised by Vernon to enter into acquiring an adjacent property. This adjacent

7   property was about 2.4 acres and based on Vernon's advice Buyer entered into an

8   option contract to purchase this additional adjacent property for $1,100,000.00. Thus

9   Buyer contracted for a total of 7.24 acres at a cumulative value of $3,600,000.

10      28.     Buyer was thus induced into investing in pre development Real Estate

11  Venture by entering into purchasing the real estate investment  property based on

12  the representations of the Broker Temecula Valley located at Temecula that: (1) the

13  price of the subject parcels (the 4.84 acres of Patricia Holmes and the option land of

14  about 2.4 acres) was fair market value as represented in the contract of about 2.5

15  million for Seller value and $1,100,000 for the option land at a cumulative price of

16  $3,600,000 (2) the property valuation would increase to about average price of

17  $24.11 per square foot or about $7,603,676 million dollars for the cumulative

18  acreage of 7.24 acres, after Buyer invested pre development moneys into permits

19  thereby promising Buyer an Investment Return of about $4,003,676 ($7,603,676 less

20  $3,600,000) or about a Rate of Return on the Investment of 111.21% (3) KWR and

1    Smith had a network of capital raising sources to provide equity capital and debt and

2    that (4) Seller and Vernon, would assist with procuring permits with the city of

3    Murrieta based on Seller's contact relationships with the City of Murrieta.

4         29.    The real estate broker Kevin Vernon acted as Joint broker with both

5    seller and buyer, in reality Kevin Vernon breached his fiduciary duty to buyer by

6    colluding with Seller and making false representations to buyer and then bringing in

7    fellow broker Andrew Smith from the same office to solicit Placement Fee services

8    contract for raising capital for Buyer and inducing Buyer to pay Andrew Smith

9    Placement Fee and or consulting fees in advance for raising Capital. The latter

10   [Andrew Smith] then proceeded to cash in the Placement Fees paid by Buyer without

11   substantial performance. Unknown to Buyer none of the defendants Temecula

12   Valley, Andrew Smith and Kevin Vernon carried a license to provide Capital

13   Advisory services and were not registered under the Investment Advisory Act or as

14   required by the California Corporation Code and Commission.   In reality as

15   discussed below, the entire scheme of inducing Buyer to invest in development land

16   project and the procuring of the Investment Advisory or Capital Advisory services

17   was a fraudulent scheme aimed specifically at inducing Buyer to invest into the real

18   estate by way of substantial land improvements and solicitation of Placement Fees

19   and Consulting Fees, for Capital Advisory services as fully discussed below.

20

30.    Temecula Valley is a local franchise of KWR and the latter is a principal and the former is an agent, in other words the relationship between the two companies is that of a principal and agent. KWR policy guidelines and manual are typically used to govern the day to day operations of the Temecula Valley office who pays the former a share of the profits or gross revenues. KWR also licenses its trade name to Temecula Valley  and provides a complete system of accounting for commissions, accounting, market center and other day to day operational protocols and systems. Temecula Valley operates under the KWR banner and follows all policies and guidelines provided by the KWR parent company.  Thus, all business activities are conducted under the KWR name and operational guidelines. Individual defendants were operating under the KWR when they rendered services to Plaintiff and all meetings were conducted at the KWR office in Temecula.  Thus under the theory of Respondeat Superior, KWR and Temecula Valley failed to supervise individual defendants when they made several misrepresentations to Plaintiff inducing Plaintiff to invest in the real estate project.  These individual brokers committed various counts of negligence, breach of fiduciaries duties and rendered Investment Advisory Services in violation of State and Federal Securities laws.

## SUMMARY OF ACTION

31.    This case is about a scheme that was developed to induce Buyer to invest into a real estate development project by way of (i) securing from Buyer a

1    falsely priced and valued piece of raw land purchase contract and (ii) then procuring

2    from Buyer a Capital Raising contract whereby Buyer substantially invested into the

3    development of the land after entering into the land purchase agreement, offered as

4    a consolidated offering that provided the defendants inflated commissions and

5    placement fees on the capital services contract. These agreements resulted in Buyer

6    paying advanced fees on the Placement fee and commission structure.

7        32.    The chief architects of this scheme were Kevin Vernon and Andrew

8    Smith, both being brokers at Temecula Valley. Kevin Vernon was initially the listing

9    broker for the seller and then acted as joint broker for both parties on purchase sale

10   transaction of the subject development parcel. Mr. Vernon then brought his

11   colleague Mr. Andrew Smith who was introduced as a person with key Capital

12   network relationships with ability to deliver necessary debt and equity capital needed

13   for the project. Subsequently based on the representations of Mr. Vernon and Mr.

14   Smith, Buyer executed both the land purchase agreement with Seller and Capital

15   advisory and Valuation services with Mr. Smith.

16       33.    Based on the representations of Vernon and Smith, Buyer entered into

17   the purchase and sale of real estate owned by Seller and the capital advisory contract

18   with Temecula Valley.  Buyer's reliance on these representations were key factors

19   in Buyer entering into the agreements with Defendants. Among the principal

20   misrepresentations were: (1) the parcel of real estate was a good deal since it was in

1    the pathway of major development and Mr. Vernon represented that the fair market

2    value of the subject price was 2.5 million dollars and that if Buyer invested in

3    improving the property then the average fair market value would be $24.11 per

4    square foot or about $7,603,676 providing a return to buyer of $ 4,003,676 or a

5    111.21% return on the Investment. In reality Mr. Vernon had provided Seller with

6    valuation of the property at about 198,180 (see exhibit number 1); selling price at

7    0.94 per square foot, this valuation was not disclosed to Buyer even though Mr.

8    Vernon acted as joint broker for the transaction. In fact, Vernon gave Buyer the

9    valuation as provided in Exhibit 2 (the average valuation of $24.11 per square foot

10   or for the 4.84 acres in question a valuation of $5,089,436, a far cry from the

11   $198,180 which he gave to Seller).

12        34.    Buyer entered into the real estate transaction based on Mr. Vernon's

13   representation that the expected profit from the investment would be $4,003,676 or

14   a return on investment of 111.21%, for the 7.24 acres (the land of Patricia Holmes

15   and the adjacent parcel). Vernon introduced his colleague Mr. Smith to Buyer

16   representing that Mr. Smith was highly networked in the area and had special access

17   to capital sources and would deliver the capital financing on the transaction.  Mr.

18   Smith represented to Buyer that he was confident that he would be able to bring in

19   capital sources to provide the needed capital for the development of the project.  Mr.

20   Smith then negotiated for Placement fee for raising capital which allowed Smith to

extract advance fees from Buyer.  The Capital services contract required several introductions to capital sources however buyer was only introduced to one, the contract also called for Feasibility study by Mr. Vernon and although Buyer paid for the services no substantial product or report was ever submitted to Buyer except for the valuation report and project feasibility based on the valuation analysis.

35.    Additionally, Mr. Vernon and Seller were aware that the pricing of the real estate represented to Buyer was misrepresented as discussed below and such misrepresentation to Buyer was made to induce Buyer to enter into the contract and make substantial investments into the subject parcel by way of re permitting and rezoning, when Buyer informed Seller that the work was substantially completed, Seller terminated the contract. Buyer has filed a related suit in State Court, against the Seller for breach of contract.

## FACTS COMMON TO ALL PARTIES AND COUNTS
## GENERAL ALLEGATIONS

36.    On or about early 2012 Kevin Vernon obtained a listing for the property described as APN numbers 392-260-009 and 392-260-010, in the City of Murrieta, California. This property was approximately 4.84 acres. This property was being advertised as a property in the pathway of major medical development and potential use of Senior living. In reality the property had just been re-zoned and the use had been changed by the City from a Business Park to Single Family Residential or SF2.

37.     At or about the same time, due to rezoning the subject parcel from Business Park to Residential the property had become less desirable for development purposes. Kevin Vernon obtained a listing agreement with the Seller and provided her with pricing analysis (see Exhibit 1) and this pricing reflected the current rezoning of the land to Residential use. At this point Kevin Vernon was Seller's listing broker only. Vernon prepared pricing analysis for Seller showing the valuation of the property at asking price of $4.11 per square foot and selling price of $0.94 per square foot (as shown in Exhibit 1). Seller and Kevin Vernon had several discussions about pricing during which Seller conveyed to Kevin Vernon that she did not want to sell the property at the Fair Market Value. Vernon never disclosed this valuation to Buyer even though Buyer formally retained Vernon to providing Broker Opinion of Value (see Exhibit 2).

38.     On or about May 2012 Plaintiff and Kevin Vernon entered into serious negotiations regarding the property. The property was being listed and offered at a price of 2.5 million dollars. Discussions by Plaintiff with Vernon to negotiate a better price did not result in any price reductions as Vernon maintained that the rezoning the property was not going to be an issue – as reflected in Vernon's advertisement of the property as use for Senior living.  Vernon maintained that Plaintiff would be gaining a significant investment return between listed price and valuation as provided by Vernon. Vernon represented to Buyer that financing the deal would be

20
COMPLAINT

serviced by Smith and the Venture would provide an attractive return on the investment. Thus any discussions on the pricing were terminated by Vernon's stated valuations and KWR's and Smith's ability to finance the deal. Based on these representations, Plaintiff entered into 2 separate contracts with KWR, the (1) the Real Estate Development opportunity by way of the land sale contract and (2) the Capital Advisory contract with Vernon, Smith and Steve Witt under the KWR name (Mr. Witt does not work for KWR but signed under their name). Last but not the least Mr. Witt was introduced as a highly successful source of capital and broker since Mr. Witt had been recently responsible for sales of the Ritz Carlton residences in downtown Los Angeles, one of the most prestigious real estate projects in Los Angeles.

39.    The primary purpose of the integrated or the consolidated offering documents (the land purchase development opportunity and the capital advisory agreement) was to allow KWR to procure inflated commissions and fee structures. Specifically following Commissions and Fees were secured: (1) inflated Capital Raising fees- Placement Fee based on the equity and debt to be raised (2) Commissions on proposed sale of potential condominiums to public (3) inflated broker commission to Vernon on the inflated price of the land (4) Consulting fees. Defendants then took advance on the Placement fees to be paid by Plaintiff. In return Buyer would invest substantial amount of moneys into the Venture (invest in

improving the land) with a promise to pay Seller note at an exorbitant price. All the above were predicated upon false valuations both on the land purchase contract and the debt and equity capital to be raised. This is reflected in the contracts executed in the agreements; Exhibit 3 and Exhibit 4.

40.     Temecula Valley  through it brokers of Record Kevin Vernon and Andrew Smith benefited by Plaintiff's entering into the 2 contracts with the defendant brokers: the Land purchase contract which provided that Buyer invest development moneys into the project and two the Capital Raising contract whereby Temecula Valley would be paid  Placement fees, Commissions and Consulting fees.

## SPECIFIC FACTS:  FRAUDULENT SCHEME AND COURSE OF BUSINESS

41.     Defendants set up in motion, two (2) separate schemes: (1) the scheme to sell vacant development land at false valuation accompanied by the sale of Promissory Note at an exorbitant price (so that Vernon could secure inflated commission) and (2) to induce Buyer to enter Investment Advisory services contract to allow Smith, Vernon and Witt to obtain inflated Commissions and Fees. The two schemes were developed by Vernon and Smith of Temecula Valley to procure excessive or inflated commissions and fees. Vernon and Smith created an illusion that Plaintiff would be achieving an attractive return on their investment by investing in the Real Estate Development Opportunity and they did this by sealing the two contracts- the land purchase and the capital advisory contract, with Plaintiff so that

each would necessarily require Plaintiff's dependence to successfully close the deal. The capital advisory agreement although a separate contract was offered as a condition to successfully closing the deal, accompanied by strong assertions of delivery, Smith's network of resources along with KWR reputation in the marketplace of superior Real Estate services, Plaintiff had little choice but to enter into both agreements.

**SPECIFIC ALLEGATIONS REGARDING FRAUDULENT SCHEME AND COURSE OF BUSINESS BY KWR DEFEDNANTS**

**THE REAL ESTATE SCHEME: INDUCING BUYER TO ENTER FALSELY VALUED REAL ESTATE DEVELOPMENT PROJECT; BUYER WAS INDUCED INTO INVESTMENT OF PRE DEVELOPMENT COSTS BY ENTERING INTO PURCHASE OF DEVELOPMENT LAND AT FALSE VALUATION AND CONTRACT FOR FALSELY PRICED PROMISORRY NOTE**

42.     The parties entered into negotiations of a purchase of developable land on or about May 2012. Buyer wanted to purchase the property for developing a medical mixed use project. The property had recently been rezoned from Business and Office use to Residential. Seller and Broker Vernon had agreed to a listing price of $2,500,000, a price that did not comport with the price for Residential use as Seller did not want to sell at the fair market value. Vernon had submitted a pricing analysis to Seller showing the selling price at 0.94 per square foot or a total of $198,180 for Ms. Holmes land. This valuation was never disclosed to Plaintiff who was told that the fair market value was $2,500,000.

43.     Vernon represented to Plaintiff that the property was in the pathway of major development, that rezoning was not going to be an issue as the City of Murrieta was development friendly, that Seller was willing to wait for a long escrow to allow procurement of permits, that the increased development activities in the area would deliver Plaintiff a fair market value as represented by Vernon in his Broker Opinion of Value. Furthermore, any financing needs would be delivered by Smith and the deal had every chance of being successful due to the combination of the services and assistance that KWR would be offering. Plaintiff had no reason to doubt the sincerity of these statements since KWR advertising was consistent with Vernon's statements. Based on these false representations Plaintiff executed both agreements with Vernon and Smith.

**IN PARTICULAR, THE FOLLOWING MISREPRESENTATIONS WERE MADE WITH REGARD TO THE PURCHASE TRANSACTION:**

44.     On or about May 2012 the parties entered into a Letter of Intent. On or about August 2012 the parties Buyer and Seller entered into the purchase and sale contract. Vernon as a Broker represented both Buyer and Seller on the contract.

45.     On or about May 2012, when Buyer raised the valuation or pricing of the developable land with Vernon, the latter said the price of 2.5 million dollars was fair market value and that the pricing on the subject parcel would not be discounted due to the fact that the subject parcel was in the pathway of major development, that Seller was agreeable to long escrow to allow procurement of permits, that the

1   valuation as reflected by Vernon to Plaintiff, see Exhibit 2, would bring valuation of

2   the parcel at about $5,089,436 or about $24.11 per square foot for Ms. Holmes land

3   providing a return of over 100% or a profit of $2,589,436. Vernon and Smith

4   represented that the financing needed to close the deal would be delivered by Smith

5   and the transaction closure was not going to be an issue. In reality Seller was not

6   read to wait for the long escrow, when Plaintiff had finished the permit studies, Seller

7   cancelled the escrow, Smith did not have the ability or the resources to deliver capital

8   and unknown to Plaintiff there was no capital division that provided capital financing

9   within the KWR as claimed by Smith, Vernon and KWR.

10      46.    On or about August 2012 Vernon provided Seller a Fair Market

11   Valuation Analysis that reflected the valuation of the subject development parcel as

12   Selling price of 0.94 cents per square foot, see Exhibit 1, or a total of $198,180 for

13   Patricia Holmes's 4.84 acres of the developable land.  This value that Vernon

14   provided to Seller was never disclosed to Buyer and was fraudulently concealed in

15   by Vernon in an effort to induce Buyer to close the transaction.

16      47.    Specifically, this valuation was never disclosed to Buyer, a duty which

17   Vernon was obligated to comply with. In fact, Vernon actually inflated the Fair

18   Market Value to Plaintiff, and lacked a good faith and reasonbale basis foro the Fair

19   Market Value. [see Exhibit 2-  Vernon's Valuation analysis to Seller and compare

20   with Exhibit 1 Vernon's valuation to Buyer].

48.     On or about May 2012 Vernon made representations that Buyer was going to get a substantial return on Buyer's investment by investing in the pre development costs and provided Buyer with a Valuation analysis reflecting the Return on the Investment. Specifically, the Return on Investment was reflected and calculated as follows:

49.     Page 14 of 14 of Exhibit 2 shows Average Value of the Land with improvements is $24.14 a square foot. Seller's land is about 4.84 acres which would amount to; 5,089,436 so according to Vernon, the purchase price of $2,500,000 would appreciate to $5,089,436 after Plaintiff re-permitted the property back giving Buyer a profit of $2,589,436. In reality the Purchase price at $2,500,000 already included an appreciation factor so even if Buyer invested in the permits, the profit was all factored into shifting to the Seller- Buyer had no profit. Vernon's representation that Plaintiff would make a whopping $2,589,436 was a false statement of fact and inconsistent with any market trends in the area at that time. Vernon's own valuation to Seller, Exhibit 1 is vastly different to valuation provided to Plaintiff, Exhibit 2. Vernon thus misrepresented the price to Plaintiff buy an amount of $ 4,825,836 (Vernon representation of value to seller at $198,180 and Vernon representation of price to Buyer at $5,089,436).

**FRAUDULENT INDUCEMENT AND MISREPRESENTATION ASSOCIATED WITH PROMISSORY NOTE**

50.     Seller and Plaintiff entered into a purchase contract whereby Plaintiff had an option to purchase the land either for cash or for 50% down with 50% Seller financing. The note was therefore for an amount equaling $ 1,250,000. However, in reality since the price of the land was only as per Vernon's pricing analysis Exhibit 1, $198,180 the remaining balance on the down and the note was a fraudulent and inflated unreal number. The Note being a part of the false valued price was itself an inflated unreal value. In reality the Note should have been half of the $198,180 or $99,090. The note was therefore inflated by the difference between the $1,250,000 and $99,090 or $1,150,910.

## THE CAPIAL RAISING SCHEME AND MISREPRESENTATIONS ASSOCIATED WITH INVESTMENT ADVISORY SERVICES

51.     Buyer was represented by Vernon and Smith, Temecula Valley, which was equipped to provide comprehensive services such as Capital Advisory services with ability to raise both debt and equity. Mr. Vernon introduced Mr. Andrew Smith from the same office and several meetings were held in the office where Buyer presented business plan to show the purpose of the development project and the capital needed to complete the project. Based on the representations of the two agents Buyer entered into a separate agreement with KWR to assist with raising capital. The following misrepresentations were made with regards to Investment Advisory Services.

52.     On or about summer of 2012 and during the period of summer of 2012 and 2013, Andrew Smith, Vernon entered into a separate contract with Buyer to assist Buyer in raising capital for the venture. Unknown to Buyer, the office at KWR was not registered as Investment Advisor either to take a Placement Fee or any fee associated with Raising Capital. What was presented was that the KWR was networked adequately enough to bring in local resources of Capital to provide the debt and equity needed for the project. KWR advertising also substantiate these statements made by Vernon and Smith. Exhibit 3 shows the Capital Raising services agreement was entered into by the Defendants and none of the brokers, Smith or Vernon had a license to provide Investment Advisory Services.

53.     During the period 2012-2013 Defendants assisted and advised Buyer in the preparation of the Information Memorandum as instructed by Smith and Vernon. The parties met with the agents in the offices of KWR located at Temecula, California.  Defendants acted as de facto issuer by advising and formulating the waterfall structure needed to be incorporated into the offering memorandum. Additionally, Buyer paid moneys to Andrew Smith and Vernon as part of the Capital Advisory agreement. Defendants did not deliver or comply with the Investment Advisory agreement. Buyer ended up paying consulting and advance fees on the Placement fee contract with no success contrary to the claims made by these defendants.

COMPLAINT

## FRAUDULENT, DECEPTIVE AND MANIPULATIVE DEVICES

54.     The complaint is based on Defendant Vernon and Smith inducement of Plaintiff into entering into two transactions, which are based on the ultimate false valuations, erroneous debt and equity calculations provided to Buyer and misrepresentations accompanying them.   The Buyer is induced to purchase the falsely valued or inflated development project [the developable land] and then using that false valuation to solicit an Equity Raising contract at the same time, representing to Plaintiff that the Capital Advisory agreement was necessary and that Plaintiff needed to engage on both fronts. The following misrepresentations and scheme were sold to the Buyer;

a.     Buyer is induced to purchase a development project that is actually valued at $198,180 but sold at valuation and listing price of $2,500,000.

b.     At the same time Buyer is told the project after Buyer invests substantial amounts of moneys will value at $5,089,436 for Patricia Holmes land and at a price of $7,603,676 for the 7.24 acres. In reality Patricia Holmes property was valued by Vernon himself at the $198,180 a valuation he did not provide Buyer Plaintiff and actively concealed from Buyer. The inflation or misrepresented amount was $4,891,256 for Patricia Holmes land – this does not include the misrepresentation factor applied for the option land.

c.     Based on the false valuation of the project provided to Buyer in item number 2 above, the Buyer is told that Buyer will need to raise 25% Equity and 75% Debt Capital based on the inflated numbers. The inflated calculations then would result in inflated commissions and fee structure.

d.     Based on the advice given to Buyer that 25% of preferred equity capital is needed, Buyer enters into a Placement fee structure which is a percentage of the amount raised. Since the amount raised is higher due to Defendant's

misrepresentations, Defendants procure a higher and inflated Placement fee and Commission. Buyer then advances a fixed fee on the Placement fee.

e. The two transactions are integrated – the sale purchase of development land and capital raising. The Capital raising or Investment advisory service is predicated upon the scheme of selling the inflated or exorbitantly priced land. The land was priced above the market price to generate consulting fees, commissions and Investment advisory placement fees.

## RELIANCE

55. The valuation of the developable land was presented to Buyer as a Broker opinion of value, see Exhibit 2 which was relied by the Buyer. Buyer used this valuation to submit to Buyer's accountants who prepared financial statements based on this valuation and this was then submitted by Buyer to Buyer's lenders. The reliance is evident and undisputed and reflected on all financial statements prepared by Buyer and submitted to various persons and lending sources. Buyer also presented various presentations using these false valuations to third parties to bring various proposed tenants and other third parties.

56. Buyer based on these representations entered into several third party contracts such as hiring engineering and third parties to prepare permit work and studies and invested substantial sums of money in developing the land, reaching out to lenders and paying substantial sums of moneys into developing this project.

57. Specifically Buyer invested approximately over half a million in development costs, and other third parties costs to develop the parcel.

**ALLEGATIONS WITH REGARDS TO FIDUCIARY BREACH BY VERNON AND SMITH**

58.    Buyer entered into specific contracts with both Vernon and Smith. Brokers Smith and Vernon had a fiduciary duty with Buyer Plaintiff.

## SPECIFIC FACTS WITH REGARDS TO FIDUCIARY BREACH BY KEVIN VERNON

59.    Mr. Vernon provided Seller with a valuation analysis that is grossly different than that provided to Buyer. At the time of purchase contract for the land, Vernon was acting a dual agent and deliberately concealed the value provided to Seller from Buyer. In fact, Vernon provided a false valuation to provider, lacking any basis in reality and fact. This is a clear breach of fiduciary duty to Buyer.

## SPECIFIC FACTS WITH REGARDS TO FIDUCIARY BREACH BY VERNON AND SMITH

60.    Mr. Vernon and Mr. Smith then provided a false valuation to Buyer and represented that Mr. Smith had a sources of capital that would or could invest about ten million dollars. Buyer based on such representations proceeded to prepare financial statements reflecting such input. In reality the only reference turned out to be a personal friend of Mr. Smith who arranged a meeting with a group which did not result in any concrete progression. Buyer in the meantime was asked to pay about approximately 30,000 dollars as advance on the Placement Fees. Mr. Smith and Mr. Vernon in reality had no contacts and no access to any reputable or interested group as they claimed. Buyer ended up spending moneys in a lot of third party accounts as a result of these representations.

COMPLAINT

## THE SECURITIES OFFERING

61.     As used herein the term "Offering Documents" includes all written materials provided to Plaintiffs prior to and contemporaneous with his/her/its/their investment in the securities. The defendants Vernon and Smith and Temecula Valley Real Estate Inc. dba Temecula Valley Inc., KWR by means of the "Property Package" offered debt and equity raising capital services. Collectively, Smith, Vernon, Temecula Valley Inc., and KWR advised Plaintiff to first purchase an inflated property, through the "Property Information Package" and then through a "Confidential Information Memorandum" arranged for securities offering for Plaintiff, acting as de facto issuer and placement agent, organized the sale of equity offering in the following manner:

62.     First, Vernon located the property and convinced Plaintiff to agree to pay an inflated price for the Property (as further described below) so that as the sellers broker he would participate in the misrepresentation of the purchase price and wait the requisite time while the securities sale process was undertaken. By colluding with Seller to sell to Plaintiff a listing price that is vastly different from the true value and by misrepresenting to Plaintiff that the value was what Seller listed while actually providing to Seller a valuation analysis that is vastly different to Buyer, Vernon secured an inflated commission structure for himself.

63.     Second, prepare the Offering Documents touting the securities[equity] offering was going to be made through Smith's network of capital sources so that substantial placement fees could be secured. In reality Smith only introduced the deal to his personal friend and the introduction was questionable.

64.     Third, after procurement of the capital raising contract, arrange for meeting with a friend networked with developer who was also referred to come in for a large consulting contract and would seal a joint venture equity contract. Subsequently a meeting with this "friend" was arranged who then arranged for meeting with a developer to offer the joint venture equity offering. This meeting was then used to state to the Plaintiff that the developer was ready to offer the joint venture equity program. Developer did notify Plaintiff that they would seriously consider the equity offering but the letter was ambiguous and most likely written as a personal favor to Smith. In the meantime, Smith extorted moneys out of Plaintiff as advances on the Placement fee.

65.     Fourth, Vernon arranged introductions to sources of capital to keep up with this farce and Plaintiff spend considerable moneys into bringing in outside consultants who were told to prepare for equity offerings based on the representations of Vernon and Smith. These meetings were organized for the express purpose to convince Plaintiff that Vernon, Smith and KWR (both the franchise company and Temecula Valley Real Estate Inc.) were bringing to closure the

preferred equity capital needed. In the meantime, as part of the process, defendants told Plaintiff's that Plaintiff needed to do a feasibility study, valuation and needed to work on a waterfall structure with an Offering Memorandum.

66.    Fifth, Plaintiff was then convinced that the feasibility study and valuation of the property needed to be done and offering memorandum with a waterfall structure needed to be provided. Thus Plaintiff was told that Plaintiff needed the following items which Defendants would assist in providing:

      a.    Property Valuation and Project Feasibility [that was built into the valuation];

      b.    Property Information Package -offering document that touted the development opportunity;

      c.    Confidential Information Project Summary: offering document; and

      d.    Waterfall structure- developed by defendants to inflate the capital to be raised by Plaintiff allowing Defendants to secure inflated commissions and fee structure.

67.    These items were then promoted as items that Defendants would provide with separate fees and commissions associated with these reports and offering documents.

68.    Sixth, Plaintiff was then convinced to advance Placement fees for arranging these equity offering opportunities. In reality these meetings were nothing but a sham for extorting fees. Plaintiff based on these representations wrote checks out to Smith and others in the KWR team but saw no completion of any services.

**THE PRIMARY FRAUDULENT SCHEME: PREPARATION OF FALSE PROPERTY VALUATION AND FEASIBLITY ANALYSIS FOLLOWED BY FRAUDULENT SCHEME OF INFLATED WATERFALL STRUCTURE AND MISSTATED PROJECT MEMORANDUM OFFERING**

69.     The primary and building block of the integrated offering; the land development opportunity and the preferred equity offering memorandum [or Information Memorandum] was dependent on three tangible products; (1) the land valuation and the (2) waterfall structure which determined the mix of debt and equity capital. [The integration of these two items were blended to allow inflated commission, broker fees and placement fees] (3) the misrepresentations that Smith had capital sources ready to deliver financing needed and that KWR had the superior capability to deliver such products [financing and investment solutions].

**THE LAND VALUATION REPORT AND THE PROPERTY INFORMATION PACKAGE**

70.     Plaintiff was induced to enter into purchasing the land parcel or property based on Vernon's representations that the land was an attractive investment.  The land parcel was packaged as an attractive investment opportunity backed by Vernon's superior expertise in the market. The details are:

        a.     The property was marketed as an attractive investment opportunity in the pathway of major development. The property was touted as suitable for "assisted living" and "skilled nursing" uses when in reality the property had been downgraded from use of business and office use to single family use (SF2).

        b.     The advertisement and the brochure were accompanied by Vernon's experience as being superior in the market place, here is what is advertised on Vernon' site:

"**The Vernon Group** is a premier provider of **commercial real estate** services in **Southern California**, as a leading commercial real estate services provider based in San Diego California we have built our business on delivering tangible results through our commitment to providing superior service and innovative process to our clients, **The Vernon Group** is firmly committed to helping our clients accomplish their business goals while increasing the value they obtain from their **real estate**. The Vernon Group's vast knowledge and market expertise provides clients with unmatched guidance in developing and structuring unique **real estate** solutions for our **commercial** clients".

c.    The land valuation report provided by Vernon to Buyer Plaintiff, reflected the permitted and rezoned valuation of the project at about $24.11 a square foot or about average value of $5,089,436 for the 4.84 acres of land under the sales contract. In reality Vernon had provided Pricing Analysis for seller at $198,180 for the 4.84 acres of land.

d.    The valuation report was then utilized by Smith to convey to Plaintiff that a 75/25 debt to equity ratio would be needed to close the financing. The inflated land value resulted in inflated debt and equity numbers creating larger commission and fee structure for Defendants.

## CONFIDENTIAL INFORMATION MEMORANDUM AND THE WATERFALL STRUCTURE PROVIDED BY DEFENDANT SMITH AND VERNON

71.    Vernon and Smith then with the assistance of a friend, Mr. Witt, helped with structuring the Offering Memorandum. A sample was provided to Plaintiff to assist with putting together the placement memorandum.  The team then engaged in

1    putting the memorandum so that the offering documents could be presented to

2    developer candidates.

3        72.    Based on the misrepresentations of Smith and Vernon and Mr. Witt

4    with regards to the valuation and development structure, Plaintiff and Plaintiff's

5    consultants proceeded to build the project financials. These financials were

6    predicated upon false valuations and waterfall formulas, provided by Defendants and

7    resulting in overstating the project value, the capital needed to close the project all

8    planned to provide inflated commission and placement fee structure needed to close

9    the project.

10       73.    Defendants knowingly misrepresented the Property Purchase price and

11   then collectively tied the falsely valued investment opportunity with inflated capital

12   needs to allow exorbitant fees and commissions.  Plaintiff was specifically assured

13   that the defendants collectively had the expertise and knowledge to provide the

14   investment solutions needed to close a commercial property development.

15       74.    Further, the following representations approved by Temecula Valley

16   were untrue and or omit material facts necessary in order to make the representations

17   made, in light of the circumstances under which they were made, not misleading:

18       a.    Vernon represented that Vernon and Smith would serve Plaintiff
     by bringing both services, the land development opportunity and the capital raising,
19   both based on the strength of the networks of these brokers and that KWR is a leader
     in the area in providing innovative real estate solutions including structuring and
20   developing such solutions.

b.     Vernon colluded with seller of the real estate parcel by having an agreement that the subject parcel would be sold at an inflated price, Vernon and Smith represented to Plaintiff that they would provide the capital raising services in return for reasonable and "standard" fees. In reality the fees were anything but "standard". Smith then convinced that Plaintiff needed feasibility analysis and appropriate Debt and Equity formulas in order to raise capital.

c.     Based on the representations that Defendant had ready sources of capital, Plaintiff retained third party consultants and executed the Placement Fee contract with Defendants.  Defendants then procured advance payments on the Placement Fees and set up meetings with potential joint venture equity developers to co invest in the project. In reality these meetings were done through personal friends and defendants failed to follow through or deliver services that were promised.

d.     The Equity and Debt capitalization formula promoted by Smith was done in a manner to inflate the amount of capital needed so that Smith could make inflated placement fees and commissions. The entire scheme was set up so that Plaintiff would provide inflated commissions, fees and other expenses.

e.     Smith then assured that commissions and compensation structure such as those being asked for were "standard" in the industry. Based on these representations Plaintiff agreed upon the compensation structure on the agreement.

75.     The Defendants Smith and Vernon acting as Real Estate brokers:

a.      Had a fundamental duty to deal honestly and fairly with all parties in the sale transaction which extends to Plaintiff as intended buyer. Vernon colluded with Seller on the price although he was a joint broker for both seller and buyer.

b.     Knew the property was being sold as a development opportunity at the inflated price and deliberately concealed the true value to Plaintiff.

c.     Misrepresented Buyer's interest on more than one occasion and created the false valuation that was then incorporated into the capital raising agreement. Vernon knew that Plaintiff would rely upon him and depended on him for negotiating a fair price.

d.      Vernon inflated the price of the development opportunity, failed to disclose his pricing sheet/analysis with an objective to provide higher broker commissions and placement fees for Smith.

e.      Both Vernon and Smith knew the falsely stated purchase price and hidden inflated commission and placement fee structure would harm Plaintiff because Plaintiff would be paying inflated fees and commissions and had Plaintiff known the true value of the development opportunity and that Smith did not have the capability to provide sources of capital, would not have entered into the transaction agreements.

f.      Vernon knew that neither Vernon and Smith had a license to raise capital as discussed below.

g.      Vernon and Smith knew their conduct as real estate brokers was immoral.

h.      Vernon and Smith knew the public policy in the regulation of real estate brokers prohibited such misconduct.

**THE KNOWN ABSENCE OF SECURITIES BROKER/DEALER**

76.      The defendants, collectively, knew that none of the brokers was a registered as a broker-dealer or an investment under under applicable law. Therefore, the offer and sale of the Securities by the defendants was in violation of Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and rules promulgated thereunder. The Securities were not registered under applicable law, including, without limation under the Securities Act of 1933 (the "Securities Act") or applicable blue sky laws.

77.      Upon information and belief, based on the advertising on KWR that specifically used or stated "real estate solutions" and "development and structure"

1    verbiage and the statements made by Vernon and Smith, Plaintiff assumed that the

2    brokers and the Temecula Valley along with KWR were registered broker-dealers.

3        78.    Defendants knew and intended that the valuation they prepared and

4    offered to Plaintiff and the waterfall structure advised (Debt Equity Capital ratios)

5    would be transmitted to candidates for investing in the project and with the express

6    purpose that Plaintiff use these false representations to prepare Information

7    Memorandum allowing inflated commissions and fees to defendants.

8        79.    Defendants collectively materially aided, assisted and participated in

9    the solicitation of the Plaintiff's moneys into the investment scheme, the purchase

10   of falsely valued development opportunity- the land integrated with the capital

11   raising scheme. Based on these representations Plaintiff invested more than half a

12   million dollars on the Investment Opportunity. The defendants knew the

13   representations were false and or misleading yet approved the Property Package

14   offering document, the guidelines for preparation of the Information Memorandum,

15   the false Debt to Equity formula and or the Waterfall structure, assisted with the

16   preparation of the Property Purchase negotiations with Seller and provided the false

17   Valuation of the Investment Opportunity in exchange for Seller's agent commission

18   and other commissions and fees as described in this document. Temecula Valley and

19   KWR aided and supported the brokers in this fraudulent scheme as they would bring

20   in higher commissions and fees at closing, given that besides these commissions,

there was more sales commissions to be due upon closing of the transaction (due to sale of potential condominiums). The defendants knew the representation that seller would pay the commission out of the falsely priced purchase price would cause Plaintiff to believe the industry convention that buyer and seller represented by dual agent broker paid by seller could be applied. In reality the representation was false because the secret markup of the purchase price of the Property was such that the commission was entirely paid by Plaintiff who had no knowledge and reason to know of the deception. This deception caused the sales commission to be highly inflated along with causing increase of needed capital which in turn would result in larger placement fees. This would result in substantial increase in transaction costs. Had Plaintiff known this Plaintiff would not have entered into the transaction.

80.    In truth, defendants had absolutely no basis for the above statements and in fact were aware that, among other things and without limitation:

a.    None of the brokers on the transaction was a licensed broker/dealer.

b.    None of the defendants was a registered investment advisor.

c.    The property selling price as reflected in Exhibit 1- pricing analysis by Vernon was not disclosed to the Plaintiffs or the third parties who were asked to invest in the deal.

d.    The hidden sales loads combined with disclosed loads were greater than that disclosed to Plaintiff and Seller and greater than represented to the Plaintiff considering the value of the real estate.

e.     The Property was not being purchased at fair market value as represented by Vernon but at exorbitant value and an unreasonable premium.

f.     The falsely valued property resulted in false valuation of the preferred equity that was being offered and the valuation of the completed permitted project as reflected in Vernon's Valuation was providing a return on investment that was false and did not comport with the market valuation at the time.

g.     The Offering memorandum with false valuations was grossly overstated showing returns on investment that would not be realized leaving Plaintiff and any other investor with substantial losses.

81.     Defendants acting with knowledge, materially participated in the sales of the Proposed Security offering and knowingly provided false information as inducement to solicit Placement fees.

## MATERIAL MISSTATEMENTS AND OMISSIONS (MMO)

82.     Buyer was induced to enter into a land development project at an inflated and falsely priced value by Defendant Vernon and Seller. Vernon had analyzed the developable land opportunity at $198,180 to Seller and then turned around and provided a valuation of $5,089,436 as average value to Buyer. The real value provided to Seller at $198,180 was fraudulently concealed to Buyer even though Vernon acted as Buyer's broker. The valuation provided to Buyer was deliberately concealed as part of the comprehensive plan to bring in Smith to raise inflated Capital amount [since the opportunity of the venture was valued at an exorbitant price and thus required inflated amount of capital for the venture] that would result in inflated commissions and placement fee.

83.     Neither Vernon or Smith disclosed that KWR and each of them, was not registered as broker-dealers or investment advisers under either the Exchange Act, the California Registration of Investment Advisors or the Investment Advisers Act of 1940 (the "Advisers Act"). Buyer was specifically told that Smith had networks of financial resources and would raise equity and debt capital and that this contract for Capital Raising would need to be executed along with the purchase contract. Based on this Buyer signed a contract for Raising Capital and invested in many third party out of pocket costs for the venture.

84.     The various causes of action as alleged below arise from the misrepresentations and material omission related to the overall investment scheme sold to Buyer including the commission and placement fee arising from sale of venture preferred stock (Equity Capital) and inflated note as described above.

85.     KWR Temecula Valley Realty shall be referred to as the Principal and Agent company respectively and Principal will be held under the respondent superior theory liable for all actions of the agent.

**FACTS SPECIFIC TO ANTITRUST ALLEGATIONS**

86.     General Allegations: Anti-Trust and Deceptive Trade Practices Act (FTC). Plaintiff brings this action, in part, under the United States anti-trust laws and the California Cartwright laws (California Anti-trust) against Defendants for illegal

1    conduct arising from Defendant's anti-competitive acts affecting the markets for sale

2    of real estate investment or development opportunities and Equity Capital markets.

3                    **FACTS PERTAINING TO ANTI TRUST CONDUCT**

4            87.    Plaintiff's claims arise out of Defendants' conspiratorial and

5    consolidated scheme to manipulate the market for commercial real estate and capital

6    markets.

7                              **INTERSTATE COMMERCE**

8            88.    Defendants activities, including activities related to their illegal, anti-

9    competitive activities, are in flow of and substantially affect interstate commerce.

10           89.    Among other things, Defendants' anti-competitive conduct results in

11   communications with one another across state lines using interstate

12   telecommunications networks, the Internet, and the United States mail and banking

13   channels. Defendants products and services at issue in this Complaint cross state

14   lines. Defendants reap substantial revenues from sales of services which are at issue

15   in this Complaint, amounting to millions of dollars, throughout the United States.

16           **RELEVANT MARKET AND DEFENDANTS MARKET POWER**

17
18           90.    The relevant geographic market for purposes of Plaintiff's claim is

     United States and other submarkets thereof.

19
20           91.    The relevant product markets for purposes of Plaintiffs claims consist

     of the following:

a.      Real estate land development investment opportunities – buying and selling of land development opportunities.

b.      Ancillary Services associated with land development such as valuation, due diligence, development services, mergers and acquisitions.

c.      Capital markets advisory services – financial analysis, Investment advisory and financing

92.     Defendants have and exercise market power within relevant markets, on information and belief Plaintiff alleges the scope and depth of KWR Market power:

93.     By the end of the decade in 2010, KWR had 77,672 real estate agents in the United States. It surpassed Century 21 as the second largest real estate agency in the U.S., two years after taking over the third spot from RE/MAX International. Between 2005 and 2011, KWR saw a 40 percent increase in the number of offices in North America. KWR went international in 2012, launching KWR Worldwide as a subdivision to manage its international franchising. It awarded its first overseas franchise in Vietnam in 2012. The same year, franchising of the company was made available in Indonesia and Southern Africa, and in 2013 expanded to Germany, Austria, Switzerland, Turkey, and the United Kingdom.

94.     At the end of April 2014, KWR reached 100,575 agents worldwide. This was due to an 18 percent increase in agents during 2013. As of 2014, it is the largest real estate franchise by agent count in North America and the only privately

held global residential real estate brokerage. In 2014, the company also announced the opening of a region in Dubai. The first Dubai franchise was awarded to a leadership group affiliated with IFA Hotels & Resorts which is considered the largest foreign investor on the Palm Jumeirah.

95.    Defendants collectively under the KWR brand combined the services offered and colluded with a third party (as discussed below) to offer a consolidated Investment offering based on representations that the fees charged are "standard" in the industry. The manner in which the consolidated services were offered created a niche market gaining an illusion of no competition to Plaintiff, price fixing and tying agreements. Defendants anti-competitive conduct also violated provisions under the Deceptive Trade Practices Act. By consolidating, colluding and having Plaintiff enter into tying agreements, Defendants secured Plaintiffs to pay unreasonable commissions and disguised fees, inflating commissions and fees to be procured, to the exclusion of any competition, are indicia of Defendants market power and unlawful anti-competitive conduct.

## ANTI COMPETITIVE CONDUCT OR ACTIVITIES

96.    Plaintiff's claims arise out of Defendants consolidated scheme to manipulate the pricing offered to Plaintiff on the integrated offering; the land development opportunity, the ancillary services and the Capital markets advisory services. The brokers Smith, Vernon and Witt engaged in a combination and

conspiracy to suppress and eliminate competition in the sale of the products (real estate development offering, ancillary services and Capital markets) by inducing Plaintiff to enter into multiple contracts with Temecula Valley based on the conduct described below thereby eliminating Plaintiffs free choice and free competition.

97.     Defendants' conduct undermines the nature of the relationship that should exist between Defendants and Plaintiff. By inducing or falsely procuring Plaintiff to enter into multiple contracts, defendants conduct created an overwhelming conflict of interest and breach of duties that have injured Plaintiff in their business and property, had reduced or eliminated competition in the areas identified above, and by conspiring among each other or by engaging in collusive conduct have engaged in wrongful practices as set forth here, is clearly at odds with the Broker duties and representations regarding services and information they are held to provide. 94.Defendants failed to disclose both their conflicts of interests and their joint conspiratorial motives. As a result, Defendants created the illusion of a competitive market for the services provided, when in fact, the pricing for the contracts entered into by the parties were the result of Defendants collusion and anti-competitive conduct.

98.     Specifically, the Broker defendants Smith, Vernon and Witt under the KWR brand [and under the operation of the Temecula Valley] colluded and created an integrated offering that was offered upon a platform of false and deceptive

representations which taken together created a unique niche for KWR considering the market power creating an illusion of market superiority and market position thereby establishing a significant advantage to the Plaintiff. By doing this, Defendants cut off Plaintiffs free choice and access to competition or competing offers and then Defendants further stated that the tying agreement would provide a considerable discount or rebate on the consolidated services, and finally after the tying agreements were secured, obtained disguised fees on services or advances on Placement fees creating a significant disadvantage to Plaintiff and market as a whole. Each of these is discussed next.

### FALSE AND DECEPTIVE REPRESENTATIONS MADE TO PLAINTIFF

99.     Vernon and Smith represented to Plaintiff that KWR is a unique brand that is equipped to offer multiple services all under one umbrella, this is evident from the advertising practices engaged by KWR and Temecula Valley.

100.     Analysis of the advertising and representations made on the web pages of Vernon and KWR:

a.     Under the website;

http://kwcommercial.com/commercial/services.html , services offered are:

> KW Commercial provides integrated real estate
> services for clients in virtually any market
> worldwide. No matter the property type or service
> need, our commercial specialists are committed to
> your needs. Combined with business expertise and

1    unsurpassed market intelligence, KW Commercial
     brokers determine and surpass your business
2    goals". The advertisement page then goes on to
     list: Corporate Services, Distressed Assets,
3    Hospitality, Industrial, International Investors,
     Land and Development, Multifamily, Office,
4    Retail and Tenant Representation.

5            b.      Under the website:

6    http://kwcommercial.com/commercial/land.html, services offered are:

7                    Under Land and Development: "KW Commercial
                     associates specializing in land brokerage and
8                    development services possess an exceptional
                     understanding of the complex factors that
9                    influence the land brokerage transaction and have
                     the extensive experience and contacts to get the
10                   deal done right. Working in coordination with our
                     other specialties, our land brokerage services
11                   include: Sales leasing and negotiation, Feasibility
                     analysis, Site selection and demographics,
12                   Valuation services, Entitlement and approval
                     services, Infrastructure analysis, Environmental
13                   resource constraints.

14           c.      Under the website:

15   http://kwcommercial.com/commercial/investment.html, services offered are:

16                   International Investors: The International Investors
                     Group is uniquely skilled in delivering customized,
17                   carefully selected commercial properties based on
                     your asset needs. Then listed the following
18                   services: Sourcing suitable investment options
                     based on your financial criteria, Valuation
19                   expertise, Handling purchase negotiations on your
                     behalf, Arrange financing for the selected and
20                   acquired real estate investment, Selection of
                     suitable management options.

d.     Under the website:

http://kwcommercial.com/commercial/corporate-services.html, services offered are:

Transaction Services: offered are: "New Locations, Early Renegotiations, Expansions, Renewals, Sublease/Buyouts, Lease Versus Own Analysis; Under Acquisition and Disposition Transactions: offered are "Site Evaluations, Economic Incentives, Property Acquisitions, Dispositions, Build-to-Suits; Under Consulting Services offered are: "Process/Systems Consulting, Lease Abstract/Lease Review, Project Construction Management, Portfolio Overview, Strategic Planning, M & A Due Diligence, Consolidations Analysis ,Benchmarking Studies, Multi-level Reporting, Competitor Analysis, Broker Opinion of Value, Alternative Financing, Alignment of Business Unit with Real Estate, Employee Relocation Services.

e.     Under the website:

http://kwcommercial.com/commercial/hospitality.html, services offered are:

Hospitality and Specialty:

Our KW Commercial hospitality professionals understand the complexity and uniqueness of a hospitality investment. Our experts; experienced in hotel sales, operations and development; provide a strong platform to meet each client's needs." Services listed are: "Acquisitions, Advisory services, Third-party property management, Brand

51

COMMPLAINT

selection and positioning, Appraisal and other valuation services, Dispositions, Market surveys and analysis, Site searches, Strategic real estate planning, Build-to-suit, Management services, Supply and demand analysis, Lease reviews and negotiations.

      f.    Under the website:

http://kwcommercial.com/commercial/multifamily.html, services offered under the

Multifamily are:

KW Commercial associates provide the very highest level of service to multifamily owners and investors with superior market knowledge and can deliver valuation and analysis of market trends. Our associates have expertise in sales, acquisition, development, finance and valuation, which extends to conventional apartment properties, condo development and conversions, student housing and residential income development land. Whether you are selling a single asset or national portfolio, our associates provide you with unparalleled market information, brokerage advisory, acquisition, disposition and financial guidance to help you achieve the highest level of results. If expanding your portfolio is the objective, our local experts can help you identify and acquire properties which meet or exceed your investment goals." Listed services are; "Finding the right property management company, Providing current rental and vacancy data, Assessing local rent control issues, Assisting with tenant leasing, Creating, preserving and maintaining long-term wealth for our clients is where we excel.

g.     Additionally, Vernon maintains a separate blog on the KWR or Temecula Valley under name and banner as follows:

> The Vernon Group is the premier provider of commercial real estate services in Southern California. As a leading commercial real estate services provider based in San Diego, CA, we've built our business on delivering tangible results through our commitment to providing superior service and innovative processes to our clients. The Vernon Group is firmly committed to helping our clients accomplish their business goals while increasing the value they obtain from their real estate. The Vernon Group's vast knowledge and market expertise provides clients with unmatched guidance in developing and structuring unique real estate solutions for our commercial clients.

101.   Together these advertisements indicate and convey to any consumer that KWR and the Vernon Group are premier provider of Real Estate Services including the offering of "real estate solutions for our commercial clients". The KWR advertisements shown above clearly offer investment solutions with several ancillary products offered to the public.

102.   KWR promotes an internal system for its brokers that it states is one of the best in the industry; the following is taken directly from the KWR guidelines manual:

a.     **"Local and Regional**

Contrary to most, KWR views the real estate industry as a local and regional business. For this reason, it has taken unprecedented measures to design

the firm as a team of regional operations. In turn, the goal of each Region is to become a major regional power by building major real estate forces in local markets. This strategy endows our associates with the strongest possible support system in the industry. Everyone wins."

      b.    Additional excerpt from the KWR Manual:

**"A True System**: In the Market Center, KWR has created the industry's strongest long term economic model time tested and proven. This was achieved only after thorough research and practical experience. For years there have been only two major real estate office economic models—traditional and 100%–desk fee. After investigating both systems carefully KWR associates chose to take the best from both. The result was a better win-win economic model which is a hybrid of the two.

    Our associates receive all of the support advantages of "traditional" while gaining more compensation advantages than just a "desk fee" concept. For the broker it provides the lowest financial risk operating system possible within a full-support company. The KWR economic and operating system delivers where others fall short."

    103.   These statements and assertions in the KWR guidelines manual provide the foundation building block where brokers are then trained to assert that the "Market Center" is strongest economic model for delivering results in the industry. It is no surprise then that the KWR brokers convey the same to the public. Such assertions foster the foundational belief and culture that KWR deliver something unique and successful to the public, something that other competitors are not able to do.

    104.   Based on this culture, Vernon assured Plaintiff as to his and KWR capability to offer Real Estate Investment solutions. As part of the overall scheme, Vernon first identified a suitable development opportunity by finding a seller an

individual by the name of Patricia Holmes who stated to Vernon that she did not want to sell the land parcel at a fair market value and priced the land at an inflated value as discussed in this document. Vernon in order to secure higher commission went along with the seller and procured a listing agreement for selling this development opportunity at a higher price. Vernon then represented to Plaintiff that this was a fair market value- although his own pricing analysis to seller was very different (Vernon's pricing analysis to seller was at 0.94 cents a square foot making the property at $198,200 not the 2.5 million purchase price that Plaintiff entered into). The property parcel development or investment opportunity was sold to Plaintiff as providing a rate of return of over 100%. This return was based on the false Broker of Opinion provided by Vernon and brining Smith to the deal wherein Smith asserted that financing for equity would be brought into by Smith and his relationship with Mr. Steve Witt, who incidentally did not even work with KWR although all parties signed on the contract. Smith specifically stated the fee structure was "standard" in the industry. In reality all- Smith, Vernon and Witt extorted fees and advances on the placement fee without delivering on the agreement.

105.   All agents or brokers, Smith, Vernon and Witt, stated that they would provide special assistance and advice in the preparation of documents and in the process of the development and structure of the real estate investment opportunity. The defendants purported to offer expert brokering advice on such factors such as

the mix of appropriate debt and equity needed to finance the property, ancillary products were provided such as Vernon's Broker opinion of Value, due diligence in sales trends; acquisition analysis, all of which were false and unsupportable by any experts in the industry.

106.   Specifically, all the above represented that the investment opportunity would be valued at a purchase price of 2.5million at time of purchase (in fact the valuation given by Vernon himself to the seller was $198, 200) and would upon re-permitting and rezoning amount yield a return of over 100% investment return. The Equity offering itself organized by Smith was based on Vernon's inflated broker opinion of value which resulted in higher commission and fee structure for all parties. Smith then brought in Steve Witt another broker from an outside firm, and all three colluded to secure the fee and commission structure stated in the attached capital raising agreement. Plaintiff was told it was "standard" in the industry. These defendants acted in concert, conspired to reduce or eliminate competition for these products discussed above and actively participated in creating an illusion of a "standard" product – a scheme targeted to gain significant unfair advantage in the market place.

107.   As set forth, contrary to these representations, these defendants did not represent their client's best interests or act as fiduciaries in connection with offering

services and products as they claim to have done. Defendants have effectuated their

scheme through a variety of methods, including, inter alia:

   a. Not disclosing or failing to adequately disclose to Plaintiff of inflated commissions or commissions created by virtue of false and inflated Broker Opinion of Value which imposed a heavy transaction cost for Plaintiff client;

   b. Steering Plaintiff to commit to the consolidated offering of the real estate investment opportunity and the capital raising scheme; based on false representations as discussed above and thereby preventing Plaintiff to go to other competitors; and

   c. Having Plaintiff commit to the tying agreement – the land development/ purchase opportunity with the capital raising contract, thereby enabling defendants to collect additional improper fees. This unlawful tying also has the effect of increasing the price of the consolidated transaction – the sale purchase with the capital raising function.

### THE COMMERCIAL REAL ESTATE PURCHASE/INVESTMENT OPPORTUNITY, THE CAPITAL MARKETS (RAISING CAPITAL) AND BROKER DUTIES

  108. The market for commercial property and raising capital or capital advisory brokerage in the United States features economic conditions that are consistent with and conducive to the conspiracy alleged herein. The commercial property investment market is dominated by the big players as discussed above KWR holds a significant market strength and advantage. The market for capital raising is again dominated by those real estate companies that provide a whole host of services under one umbrella. Thus once a player dominates one sector and is able to provide a second set of services, and holds itself as an expert the options to a consumer then become very limited creating a situation of a monopoly as there are

far and fewer companies that can do all the above. Here is what KWR holds out to be.

109.   The Services that KWR agencies or franchisees, under the KWR name advertise to provide to their clients, inter alia, analysis of risk and investment options, real estate solutions, due diligence, financing, transactional advisory, broker opinion of value and appraisals, etc. (all the services shown above on the website). It is because they offer these services that customers, like Plaintiffs and others in similar situation seek out broker defendants for their expertise, skill and experience.

110.   In their marketing material, the defendants represent that they are highly skilled and independent experts and possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business and personal risks faced by clients in the commercial real estate business, thereby promoting that clients are best served by such unique experience and expertise.

111.   Based on these representations, defendants encouraged Plaintiff to rely on their widely purported knowledge independence and expertise in procuring insurance coverage. Defendants counseled Plaintiff in the entire process of the closing on the deal, the real estate due diligence, analysis, trend and investment analysis including acting as de facto issuer of the preferred security offering to bring equity capital to the table. Based on providing the complete host of complex services

including the ancillary products provided to Plaintiff, defendants acted as fiduciary at many fronts.

112.   Plaintiffs rely upon the sophistication and expertise of the Broker Defendants -- derived from Broker Defendants' familiarity with the overall marketplace, as well as customs and practices of the industry -- to make informed independent decisions when formulating strategies concerning their real estate needs and risks. Plaintiffs therefore engaged the services of the Broker Defendants in order to assist them in meeting many different aspects of their real estate needs, including but not limited to due diligence, trend and acquisition analysis, transaction advisory such as understanding the local market etc.

113.   In their standard contracts with plaintiffs, the Broker Defendants agreed: (i) that they will solely represent the interests of their clients in transactions; (ii) that they will act on behalf of their clients in the selection of appropriate real estate and services agreed upon; (iii) that they will act pursuant to the industry standards which impose certain standards on the profession. These representations are made through the KWR advertisements, internet sites/ web etc.

114.   Further the KWR guidelines and policy manual states the following with respect to Anti-trust compliance:

1

**Antitrust Compliance Policy**

2

The commission rates for a Market Center are based upon the cost of the

3
services provided by that Market Center, the value of these services to their clients
and certain competitive market conditions. Commission rates are not determined
by KWR, the International ALC, nor any other person(s) not a party to a Listing

4
Agreement or Buyer Representation Agreement with a particular Market Center.
Business must be conducted in accordance with all applicable antitrust law. This

5
includes, but is not limited to the following:

6

7
Associates affiliated with any Market Center shall not discuss (and shall not be
present at any discussion of) commission rates charged by their Market Center or
any other real estate brokerage in their community or any other community with

8
any person affiliated with any other real estate brokerage, including other KWR
Realty brokerages, any real estate industry trade association, or any entity

9
undertaking a survey of such rates. Any questions or concerns regarding discussion
of fees or commissions should be directed only to the Market Center broker or TL.

10
The broker or TL will consult with an attorney on all commission matters for
which they do not have a response for the questioning associate.

11

12
However, in reality Smith and Vernon brought in outside broker Mr. Steve Witt

13
and the three executed a capital raising contract that secured inflated    and fees.

14
Mr. Witt signed under the KWR contract when in fact Mr. Witt is not even a

15
broker under the KWR or that of Temecula Valley Real Estate Inc. Additionally

16
Smith represented that the fees charged are "standard" in the industry creating an

17
illusion of price fixing.

18

19

20

**DEFENDANTS IMPROPER COMMISSION AND FEE STRUCTURE AND KICKBACK PAYMENTS; BROKER DEFENDANTS RECEIVED PAYMENTS THAT WERE DISGUISED KICKBACKS WITHIN THE KWR SYSTEM**

115.   Although Defendants pursuant to the agreement between the defendant and Plaintiff receive a commission and fee, such fees were not compliant either with the agreement or that disclosed to Plaintiff. The agreement called for payments to Smith under the KWR. Plaintiff paid the first installment of about $8000.00 to Smith under the KWR name. When Plaintiff got ready to pay the Second and third installment of each $8000.00 Smith demanded that such payments be made to his personal business under the name of "AJ realty". Thus Plaintiff made a total payment of about $16,000.00 paid to an account that was deposited to Smiths personal business account, not the KWR that the parties had agreed to do. The $16,000.00 was in essence a disguised kickback payment or undisclosed non-compliant payment that was not recorded on the KWR books.

116.   Additionally, Vernon payments were never recorded on the books and only partial work was performed by Vernon. Upon payment and belief, Plaintiff believes that Steve Witt was paid some amount from the fees but and such payments did not hit the KWR books either.

117.   Such payments are not in accord with KWR policy and guidelines. These payments were in Plaintiff's opinion, disguised kickbacks to bring in large commissions on the potential integrated agreements- the land purchase development

1  and the capital raising agreement which also called for commissions on proposed

2  sale of condominiums.

3      118.   Defendants either failed entirely to disclose the Fee and Commission

4  Agreements or fail to adequately disclose them. These undisclosed fees, coupled

5  with Defendants' anti-competitive steering, and tying arrangements (described

6  below), mean that plaintiffs are not aware of their existence, operation or effect.

7  Taken together, Defendants breached the duties owed to their client plaintiffs, by

8  failing to fully and accurately disclose, inter alia, the following:

9          (a) the existence, source and amount of their Fees and Contingent
10  Commissions;

        (b) the material impact of the Fees and Contingent Commissions on
11  their overall profitability;

         (c) that the Fees and Contingent Commissions have created economic
12  incentives for Defendants to act contrary to their fiduciary duties to plaintiffs;

13         (d) that the Fees and Contingent Commissions have created economic
   incentives for Defendants to act contrary to their duty of care to plaintiff;

14         (e) that the Fees and Contingent Commissions have created economic
15  incentives for Defendants to act contrary to their duty of loyalty to plaintiff;

         (f) that the Fees and Contingent Commissions have created economic
16  incentives for Defendants to act contrary to their duty to provide impartial advice to
   plaintiff;

17         (g) that the Fees and Contingent Commissions have created economic
18  incentives for Defendants to act contrary to their duty to exercise their best judgment
   on behalf of plaintiff;

19         (h) that the Fees and Contingent Commissions have created economic
   incentives for Defendants to act contrary to their duty of candor and full disclosure
20  to plaintiffs and

COMPLAINT

(i) that the Fees and Contingent Commissions have created economic disincentives for Defendants to carry out their contractual obligations to plaintiff.

In the absence of proper disclosure of the Fees and Contingent Commissions, plaintiffs justifiably relied, to their detriment, on Broker Defendants' representations that they were providing independent expertise and representing their clients' interests in accordance with their contractual, fiduciary and other duties as alleged above.

## TYING AGREEMENT AND APPLICABLE LAW

119.   The Sherman Anti-trust Act is the nation's means of ensuring that competition is maintained, that trade and commerce are not restrained, and that the consumer gets the benefits of lower prices, better product and more efficient production methods. Section 1 of the Act deals with the means by which competition is restrained and Section 2 deals with the results of those actions. Coupled together, Sections 1 and 2 address almost every conceivable act prohibited by the Act. Section 1 of the Sherman Act, 15 U.S.C. § 1 provides in pertinent part

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by

> imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

Section 2 of the **Sherman Act, 15 U.S.C. § 2** provides in pertinent part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

The Act applies to real estate brokerage business, *U.S. v. National Association of Real Estate Bds.*, 339 US 485, 70 S. Ct. 711 (1950).

120.   Under federal and state anti-trust laws, tying arrangements reflect arrangements by which a party agrees to sell one product but on the condition that the buyer also purchase a different and separate product. Tying arrangements often arise when a party has market power or monopoly power such that the party can force a buyer to buy the tied product even though the buyer wants to buy the tying product. Tying agreements or arrangements are per se violations of the Sherman Anti-trust violations just as arrangements which fix prices. As applied to the foregoing facts, Plaintiff was induced to buy the real estate investment development

1  opportunity- the tying product along with the capital raising scheme (the tied

2  product) based on false representations of valuations provided by Vernon to allow

3  the defendants collectively to garner inflated commissions and fees as described in

4  this document.

## CALIFORNIA CARTWRIGHT ACT; BUSINESS AND PROFESSIONS CODE SECTIONS 16700:16770

7     121.   A combination formed for the purpose and with the effect of raising,

8  depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or

9  foreign commerce is illegal per se under the Cartwright Act.

10    122.   As discussed above applying these laws to the foregoing case, Plaintiff

11 was first indoctrinated with the KWR portfolio of services and culture as enunciated

12 above providing an impression that due to the unique market position and dominance

13 and the type of services offered, Plaintiff would be best served by engaging them

14 (Temecula Valley) to provide an integrated offering of both- the land sale

15 development opportunity and the capital raising agreement. Plaintiff did not have a

16 chance to doubt the "wondrous" opportunity of having a one-stop shop especially

17 when the fee structure and commissions were sold as "standard" in the industry.

18 Based on the above, Plaintiff, alleges the following counts in violations of the Anti-

19 trust, federal and state:

20

**COUNT I : VIOLATION OF THE SHERMAN ACT SECTION 1. (Contract, Conspiracy, Combination, and Agreement in Restraint of Trade that is Per Se Unlawful)**

123. Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

124. Defendants and their officer and or agents by means of their actions, entered into a contract, combination or conspiracy specifically intended to allow them to maintain an integrated offering of the services contracted for: land development opportunity and the capital raising agreement, by offering these as a consolidated offering, defendants (1) limited Plaintiff's options of seeking and considering alternatives- limited access to alternatives (2) prevented Plaintiff from reaching out to other competitors (3) secured Plaintiffs commitment to 2 separate products, alleging better pricing which were disguised under the "standard" fee allegations but in reality were exorbitantly priced- the consolidated effect of the 2 agreements resulted in inflated commissions and fees which would not have occurred had plaintiff reached out separately to other market players.

125. The actions of defendants, along with Mr. Witt, also constitutes an illegal price fixing scheme by which the pricing of the consolidated transaction was improperly increased. Since the actions of the defendants constitute an illegal

agreement to limit competition, these actions or conduct by defendants constitute a per se violations of Section 1 of the Sherman Act

126.   Such actions of defendants were and are part of and affected the commerce of the United States. They have a substantial effect on interstate commerce. Such actions of Defendants are per se violations of the Sherman Anti-Trust Act based on the illegal tying of broker services offered to Plaintiff, and the plaintiff has suffered damages.

**COUNT II:  VIOLATION OF THE SHERMAN ACT SECTION 2. (Attempt to Monopolize).**

127.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

128.   By arranging the consolidation of the two products under one umbrella, and by bringing in a third broker Mr. Witt and forming a collusion by which both services were offered in a combination of persons, Defendants denied Plaintiff a free access to market competition. Further by stating that such fees and commissions were "standard" in the industry defendants completely cut of any access that Plaintiff would have had, if such representations and combination had not occurred- in essence creating a monopoly which restrained trade in the product sector defined above.

129.   By virtue of their market power and actions Defendants were able to illegally tie their services and charge inflated fees and secure exorbitant commission structure.

130.   By virtue of their market power and actions Defendants likewise deprived Plaintiff of their right to seek other market options or reach out to competition.

131.   The effect of defendants' actions were to foreclose substantial amount of interstate commerce.

132.   The actions of defendants constitute a per se violation of Section 2 of the Sherman Act, and the plaintiff has suffered damages.

## COUNT III: CALIFORNIA CARTWRIGHT ACT; BUSINESS AND PROFESSIONS CODE SECTIONS 16700:16770

133.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

134.   Plaintiff alleges violation of the California Cartwright Act, which mirrors the Sherman Act, and, as a result, the plaintiff has suffered damages.

## COUNT FOUR: SECURITIES VIOLATIONS; 15 U.S.C. SECTION 78j

135.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

136.   Defendant Vernon had a fiduciary duty to disclose the true valuation of the investment property, Defendant Smith has a fiduciary duty to disclose that neither of the brokers nor the Company defendants was licensed to raise capital and none of them had the ability to provide the services of Capital Raising. Fees taken as Placement fee by Buyer were in violation of various Securities laws and Regulations. Both defendants (Vernon and Smith) failed to comply with various securities law and regulations when false valuations and representations were provided to Buyer to induce Buyer to invest in the venture. In particular the Securities act, 15 USC section 78j provides under "Manipulative and deceptive devices" that: it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities -based swap agreements, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. Defendant Vernon and Smith violated such provisions of the Securities laws.

137.   Defendants made these MMO (Material Misstatements and Omissions) knowing that they were false and intending that Plaintiff rely on them.

1   138.   Plaintiff did rely on these statements as the agents cultivated

2   relationship with Buyer/Plaintiff; see Declarations attached herewith showing that

3   such statements were relied upon. Defendants made such MMO knowing that

4   Plaintiff would rely on such Valuations and Misrepresentations.  Plaintiff would not

5   have invested in the venture had Plaintiff been provided a true and correct copy of

6   the valuation as provided to Seller by Vernon and would not have entered into the

7   transaction if Smith had not represented that he had connections with local access to

8   Capital. Plaintiff would not have entered into the transaction if Plaintiff knew that

9   the activities engaged as Capital Raising were being promoted without State and

10  Federal licensure requirements as fully discussed below.

11   139.   As a direct and proximate result of Defendants' assertions and

12  misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and

13  seeks substantial economic damages including but not limited to, the out of pocket

14  costs, losses incurred and reasonable attorney fees.

15  **COUNT FIVE: SECURITIES VIOLATIONS; 15 U.S.C. SECTION: 10B**
16  **AND RULE 10B-5;**

    140.   Plaintiff realleges and hereby incorporates by reference, all the

17  foregoing allegations as if fully stated herein, inclusive, in their entirety, with the

18  same force and effect as if the same were set forth fully herein.

19   141.   Defendant Vernon and Smith collaborated on a comprehensive

20  Investment Scheme.  Vernon arranged to provide Plaintiff Buyer a valuation that

was highly inflated and false (false because he had provided the Seller with a totally different valuation) and then brought his colleagues Smith to secure an inflated commission Fee structure on the Placement contract (contract for Capital Services Agreement).

142.   The entire Venture of both the sale of the land and the offer for sale of securities was predicated on the False Valuation Analysis for the venture. Both defendants violated  SEC Rule 10b and 10b-5 which states: it is  unlawful for any person, in connection with the purchase or sale of security: (a) To employ any devise, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person …..".

143.   Defendants made these MMO (Material Misstatements and Omissions) knowing that they were false and intending that Plaintiff rely on them.

144.   Plaintiff did rely on these statements as the agents cultivated relationship with Buyer/Plaintiff; see Declarations attached herewith showing that such statements were relied upon. Defendants made such MMO knowing that Plaintiff would rely on such Valuations and Misrepresentations.  Plaintiff would not have invested in the venture had Plaintiff been provided a true and correct copy of

the valuation as provided to Seller by Vernon and would not have entered into the

transaction if Smith had not represented that he had connections with local access to

Capital. Plaintiff would not have entered into the transaction if Plaintiff knew that

the activities engaged as Capital Raising were being promoted without State and

Federal licensure requirements as fully discussed below.

145.  As a direct and proximate result of Defendants' assertions and

misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and

seeks substantial economic damages including but not limited to, the out of pocket

costs, losses incurred and reasonable attorney fees.

## COUNT SIX: SECURITIES VIOLATION OF SECTION 9(A)(4) OF THE EXCHANGE ACT

146.  Plaintiff realleges and hereby incorporates by reference, all the

foregoing allegations as if fully stated herein, inclusive, in their entirety, with the

same force and effect as if the same were set forth fully herein

147.  New Section 9(a)(4) of the Exchange Act makes it unlawful for any

broker, dealer or other person selling or offering to sell (or purchasing or offering to

purchase) any security other than a government security, "to make. . . for the purpose

of inducing the purchase or sale of such security, . . . any statement which was at the

time and in the light of the circumstances under which it was made, false or

misleading with respect to any material fact, and which that person knew or had

reasonable ground to believe was so false or misleading."

148.   Vernon and Smith made false statements and misrepresentations to Plaintiffs that the development opportunity would provide a return on investment that were totally false as discussed earlier and concealed the true value of the development opportunity and inflated the investment opportunity as well as extracted advances on Placement Fees.

**COUNT SEVEN: CALIFORNIA CORPORATIONS CODE SECTION 25401.**

149.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein.

150.   California Corporations Code Section 25401 makes it unlawful for any person to offer or sell a security in this state by means of any written or oral communication which includes an untrue statement of material fact or an omission of a material fact.

151.   The preferred stock offering for the venture and the subject of the Capital Services contract with KWR are "securities" as defined in the Corporations Code section 25019.

152.   In offering and selling these interests, the agents and Defendants Smith and Vernon on behalf of KWR made untrue statements and or misrepresentations of material facts to some or all of the prospective investors. These misrepresentations included, without necessarily being limited to:

153.   Statement made with regards to the Value of the Venture or development opportunity.

154.   Statements made to Buyer that Smith was going to introduce to sources of Capital and in return induced Buyer to pay Placement fee to Smith and KWR.

155.   Statement made to Buyer that Smith of KWR was networked with sources of Capital and had the ability of providing Investment Advisory services.

156.   Statements made with regards to the experience and standing in the field to provide services associated with investment advisory services.

157.   Representations that Buyer's Placement Information Memorandum was being presented to sources of Capital after advising Buyer on the preparation of Placement Information Memorandum

158.   These statements both individually and collectively were designed to and did induce Buyer to invest in the Venture, when in fact the reality was that there neither Vernon nor Smith was capable of providing services and the valuation of the development project was inflated to allow higher commissions and Placement Fee.

159.   In offering to sell preferred stock in the venture, both Smith and Vernon omitted to disclose the following:

160.   The true valuation of the development project

161.   The true valuation of the appreciated opportunity was inflated to procure the Investment Advisory and Capital Raising services contract.

162. That neither Vernon nor Smith was experienced and did not have the licensure or registration required under both State and Federal laws and

163. That neither Vernon nor Smith had any resources to bring capital to the project.

164. The misrepresentations and omissions were made in connection with the offer and sale of securities within the meaning of Corporations Code section 25017.

165. The misrepresentations and omissions took place within the State of California within the meaning of Corporations Code section 25008.

166. As a direct and proximate result of Defendants' assertions and misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

**COUNT EIGHT: TRANSACTION, PRACTICE OR COURSE OF BUSINESS TO DEFRAUD BY INVESTMENT ADVISOR: CALIFORNIA CORPORATIONS CODE SECTION 25235**

167. Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

168. At all relevant times, both Smith and Vernon and in particular Smith operated as Investment adviser to Plaintiff when they advised and guided the

1  preparation of the Placement Information Memorandum offering documents, within

2  the meaning of Corporations Code section 25009.

3    169.  Smith and Vernon violated Corporations Code section 25235 by

4  engaging in acts, practices or a course of business as an investment adviser that are

5  fraudulent, deceptive or manipulative by making material misrepresentations and

6  omitting material facts necessary in order to make the statements made, in light of

7  the circumstances under which they were made, not misleading, including, but not

8  limited to, those set forth by this Complaint.

9    170.  In addition to the conduct alleged above, Defendants Smith and Vernon

10  have violated Corporations Code section 25235 by distributing the Placement

11  Information Memorandum to third parties by including the false valuations included

12  in the Memorandum.

13    171.  As a direct and proximate result of Defendants' assertions and

14  misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and

15  seeks substantial economic damages including but not limited to, the out of pocket

16  costs, losses incurred and reasonable attorney fees.

17  **COUNT NINE: UNTRUE AND MISLEADING STATEMENTS;**
**CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17500**

18    172.  Plaintiff realleges and hereby incorporates by reference, all the

19  foregoing allegations as if fully stated herein, inclusive, in their entirety, with the

20  same force and effect as if the same were set forth fully herein.

173.   Defendants Smith and Vernon made several material misleading manipulative and deceptive statements, these include, but are not limited to:

174.   Statements made by Smith that he is well networked and has access to capital resources needed for the venture.

175.   Statements regarding Smith's qualifications as a Placement Advisor, his understanding of the market, his connections to other brokers and sources of capital and local resources in the marketplace.

176.   Absolute failure to disclose that neither Smith nor Vernon had the ability or track record to deliver the services sold to Plaintiff and that providing such services were not compatible with the standards required for Investment Advisors under the Investment Advisory Act.

177.   These statements are untrue and misleading because Plaintiff was led to believe that Smith and Vernon were professionals in the services contract that Plaintiff entered into. Vernon induced Plaintiff to enter the development purchase venture opportunity based on false and highly inflated purchase/selling price which became the center piece to procure the Capital Raising Contract which included the inflated commissions and Placement Fee structure.

178.   As a direct and proximate result of Defendants' assertions and misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and

seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

## COUNT TEN: UNFAIR COMPETITION; CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

179.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

180.   At all relevant times, Smith and Vernon acting individually and collectively, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to engage inn acts, or practices that constitute unfair competition as defined in Business and Professions Code Section 17200. Such acts or practices include but are not limited to, the following:

181.   Violating Business and Professions Code 17500 and other state claims as discussed herein in this Complaint.

182.   Statements made by Smith that he is well networked and has access to capital resources needed for the venture.

183.   Statements regarding Smith's qualifications as a Placement Advisor, his understanding of the market, his connections to other brokers and sources of capital and local resources in the marketplace.

184.   Absolute failure to disclose that neither Smith nor Vernon had the ability or track record to deliver the services sold to Plaintiff and that providing such

services were not compatible with the standards required for Investment Advisors under the Investment Advisory Act.

185.   Distribution of false Information Memorandum by virtue of providing false valuation on the development opportunity.

186.   As a direct and proximate result of Defendants' assertions and misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

**COUNT ELEVEN: VIOLATION OF REGISTRATION REQUIREMENTS OF CALIFORNIA SECURITIES LAWS AGAINST ALL DEFENDANTS**

187.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

188.   Plaintiff is informed and believes and, on that basis, alleges that at all times relevant, Smith and Vernon were each and collectively acting as a "broker-dealer" as that term is defined under California Corporation Code section 25004 and other applicable law. Pursuant to California Corporation Code section 25210, no broker-dealer is permitted to effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker-dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing the person to act in that capacity." Plaintiff is informed and believes, on

1  that basis, alleges, that by engaging in the conduct described above, Defendants

2  Smith and Vernon acted in violation of the foregoing section 25210.

3      189.  As a direct and proximate result of Defendants' assertions and

4  misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and

5  seeks substantial economic damages including but not limited to, the out of pocket

6  costs, losses incurred and reasonable attorney fees.

7
   **COUNT TWELVE: VIOLATION OF CIVIL CODE SECTION 3372:
   DEFENDANTS FAILED TO EXERCISE DUE CARE IN RENDERING
8                   SERVICES TO PLAINTIFF**

9      190.  Plaintiff realleges and hereby incorporates by reference, all the

10  foregoing allegations as if fully stated herein, inclusive, in their entirety, with the

11  same force and effect as if the same were set forth fully herein.

12      191.  Defendants Smith and Vernon collectively sold a real estate investment

13  opportunity to Plaintiff whereby Plaintiff was induced to enter the deal at inflated

14  and false valuation resulting in inflated commissions and Placement Fee structure,

15  all this based on Plaintiff's reliance on the Defendants expertise which was promoted

16  in a deceitful and manipulative fashion.

17      192.  Plaintiff relied upon Defendants Smith and Vernon for their superior

18  knowledge regarding subject the investment opportunity for at least two reasons: (1)

19  Vernon represented that he is a commercial broker and represented that he was

20  selling a real estate investment with a valuation that was providing attractive returns

1   on the investment as shown on his Broker opinion of Value and (2) that Smith would

2   bring the Capital Raising services as he was well versed with the Market and contacts

3   in the industry.

4       193.   With regards to representations made by Vernon, who was equipped

5   with superior knowledge, in the real estate investment opportunity; plaintiff's

6   reliance was justified due to Vernon's superior knowledge. Where the person has

7   superior knowledge regarding the subject matter of the representations, and the other

8   party is so situated that he or she may reasonably rely on that supposed superior

9   knowledge or special information, the representations may be construed as fact, not

10  opinion. Tool v Richardson-Merrill, Inc., 251 Cal 2d 689, 706 (1967).

11      194.   Defendants violated Civil Code Section 3372 (a) which states that 3372.

12  (a) Any person engaged in the business of advising others for compensation as to the

13  advisability of purchasing, holding or selling property for investment and who

14  represents himself or herself to be an expert with respect to investment decisions in

15  such property, or any class of such property, shall be liable to any person to whom

16  such advisory services are furnished for compensation and who is damaged by

17  reason of such person's reliance upon such services, for the amount of such

18  compensation and for such damages, unless the person rendering such services

19  proves that such services were performed with the due care and skill reasonably to

20  be expected of a person who is such an expert.

195. As a direct and proximate result of Defendants' assertions and misrepresentations, Plaintiff's reliance on such statements, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

**COUNT THIRTEEN: AIDING AND ABETTING UNLICENSED PERSON OR UNREGISTERED COMPANY TO EVADE LAW; CALIFORNIA CORPORATIONS CODE SECTION 8639**

196. Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

197. Defendants Temecula Valley and KWR at are both liable for the fraudulent representations made by defendant Smith and Vernon, since the latter two (Smith and Vernon) were acting as Defendants Temecula Valley's employees within the scope of employment and also for KWR that is the franchisor for Temecula Valley, Civil Code sections 2330, 2338; Ach v. Finkelstein, 264 CA 2d 667, 677 (1968). The fact that the knowledge acquired by agent was not actually conveyed to the principal does not prevent the operation of the rule. Maron v. Swig, 115 CA 2d 87, 90 (1952).

198. Defendants KWR and franchisee are both jointly and severally liable for aiding and abetting an unlicensed individual or unregistered company, or allowing one's license or company registration to be used by an unlicensed

individual or unregistered company, or acting as agent or partner or associate, or otherwise, of an unlicensed individual or unregistered company to evade the provisions of this chapter is a ground for disciplinary action.

199.   As a direct and proximate result of Defendant's aiding and abetting Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

## COUNT FOURTEEN: FRAUD, DECEIT AND CONCEALMENT (AS REGARDS TO DEFENDANTS SMITH AND VERNON)

200.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

201.   Defendant Vernon induced Plaintiff to enter the real estate investment purchase and sale transaction by providing a valuation price different that what he provided the Seller, and then providing a Valuation Analysis (Broker opinion of Value) to Plaintiff that showed an attractive return on the appreciation and investment on the deal. Vernon was broker of record for both Seller and Buyer and failed to show the pricing analysis that he provided Seller. The details are as follows:

202.   With regards to Vernon:

a.       On or about August 2012 Vernon provided a pricing analysis to Seller valuing the development opportunity at $198,180.

b.     On or about August 2012 Vernon represented to Buyer/Plaintiff establishing the price of the deal at $2,500,000 AND valuation at $5,089,436 see Exhibit 2, [different than that provided to Seller].

c.     On or about the same time Vernon provided Buyer or Plaintiff with a broker opinion of value showing the value of the Sellers real estate investment opportunity at $5,089,436 for Patricia Holmes land and cumulative valuation of investment value at $7,603,676 for the 7.24 acres.

d.     Vernon failed to disclose this difference to Plaintiff. Vernon misrepresented and lied about the pricing numbers to Plaintiff as is evident on this analysis provided to Seller.

e.     Vernon then, provided a highly inflated return on investment to Plaintiff. Based on the valuation report [exhibit 2] Plaintiff invested in the real estate investment opportunity.

f.     Plaintiff relied on these reports and invested considerable sums of moneys in the pre development costs, accounting legal, marketing the opportunity etc.

203.   With regards to Smith:

a.     Smith represented that he was networked and would act as Placement Agent and provide the necessary debt and equity capital.

b.     Smith represented that he was adequate contacts in the industry and would bring in requisite person or persons to enable reaching out to sources of capital.

c.     In reality Smith was unable to perform and besides one meeting no groups or sources of capital were ever introduced to Plaintiff.

d.     In reality Smith was not registered to provide the services for Capital Raising and violated several State and Federal laws that require such registration.

e.    Based on these representations Plaintiff started to invest in marketing the project, seeking other third parties to come in as potential tenants etc.

204.   As a direct and proximate result of Defendants Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

## COUNT FIFTEEN: AIDING AND ABETTING FRAUD

205.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

206.   Defendant Smith and Vernon committed a complex scheme to induce Plaintiff to invest in the real estate investment designed to produce Placement Fees, Commissions and other consulting fees as reflected in the contracts entered into by the parties. Plaintiff is informed and believes and thereon alleges that Defendant Companies, aided and abetted the fraud.

207.   Defendant companies, have both, internal policies in place to signal and guard against this type of conduct. Defendant companies made no attempts at verifying the legitimacy of such operations or meetings that were being conducted on the office locations. Such conduct could easily have been discovered as these meetings were done in the presence of other staff in the offices.

208.   As a direct and proximate result of Defendant's aiding and abetting Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

### COUNT SIXTEEN: MISREPRESENTATION, INTENTIONAL AND NEGLIGENT MISREPESENTATION

209.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

210.   Defendant Smith and Vernon had a duty to provide honest and accurate information to Plaintiff so that Plaintiff could make informed decision on investing in the real estate development opportunity.

211.   Defendant Vernon represented to Plaintiff the valuation as reflected in the purchase contract knowing that the valuation was different than that provided to Seller, intentionally misrepresenting the valuation to Plaintiff.   Vernon then misrepresented that Smith would bring in Capital raising capability knowing that Smith did not offer such services as part of his regular portfolio of services. Vernon also represented that the course of getting pre development permits would be facilitated by Seller who was locally entrenched in the community. All these representations were false, Plaintiff relied on these representations and invested substantial moneys into the venture opportunity.

212.   As a direct and proximate result of Defendants Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

## COUNT SEVENTEEN: AIDING AND ABETTING MISREPRESENTATION

213.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

214.   Defendant companies aided and abetted the wrongful conduct engaged in by defendants Smith and Vernon when they cashed the checks written by Plaintiff. Plaintiff had paid compensation for services provided to KWR.

215.   Defendant companies, have both, internal policies in place to signal and guard against this type of conduct. Defendant companies made no attempts at verifying the legitimacy of such operations or meetings that were being conducted on the office locations. Such conduct could easily have been discovered as these meetings were done in the presence of other staff in the offices.

216.   As a direct and proximate result of Defendant's aiding and abetting Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

## COUNT EIGHTEEN: BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY

217.   Plaintiff realleges and hereby incorporates by reference, all the foregoing allegations as if fully stated herein, inclusive, in their entirety, with the same force and effect as if the same were set forth fully herein.

218.   Defendants Smith and Vernon each breached the terms of the contract and duty of good faith and fair dealing. Defendant Vernon breached the duty of loyalty and good faith when he failed to disclose the true value of the real estate and when he provided a false valuation report to Plaintiff.  Defendant Smith breached the terms of the contract when he falsely promoted that he could provide capital raising services when he did not have the necessary licenses and ability to provide such services.

219.   Both defendants had a fiduciary duty to be completely honest and transparent to Plaintiff, both of them breached their fiduciary duties when providing false and MMO with regards to statements made in connection with sale of preferred stock and raising capital and the real estate transaction.

220.   As a direct and proximate result of Defendant's aiding and abetting Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic damages including but not limited to, the out of pocket costs, losses incurred and reasonable attorney fees.

1

## COUNT NINETEEN: NEGLIGENCE

2      221.   Plaintiff realleges and hereby incorporates by reference, all the

3   foregoing allegations as if fully stated herein, inclusive, in their entirety, with the

4   same force and effect as if the same were set forth fully herein.

5      222.   All defendants owed Plaintiff a duty to exercise reasonable skill, care

6   and prudence. Defendants Smith and Vernon positioned themselves as trusted

7   advisors whose only goal was to assist Plaintiff to close the development

8   opportunity. In doing so they became the chief architects of a complex web or

9   scheme to defraud Plaintiff and acted recklessly and negligently and breached their

10   duty of care to Plaintiff.

11      223.   Defendant companies KWR and franchisee Temecula Valley Realty

12   did not conduct due diligence per regulations intended to protect the public. In failing

13   to engage in due diligence, each of these defendants breached its duty of reasonable

14   care to Plaintiff.

15      224.   As a direct and proximate result of Defendant's aiding and abetting

16   Smith and Vernon's conduct, Plaintiff has suffered and seeks substantial economic

17   damages including but not limited to, the out of pocket costs, losses incurred and

18   reasonable attorney fees.

19

20

**COUNT TWENTY; REGISTERED INVESTMENT ADVISERS
STATUTORY FRAMEWORK AND REGULATORY SCHEME
CALIFORNIA CORPORATIONS CODE SECTIONS 25200-25209 AND
25230-25238**

225.   The capital services agreement was executed between Plaintiffs and Vernon, Smith, Witt, Temecula Valley. The agreement is executed under the name of "KWR" and defendants collectively conducted meetings and presentations pursuant to this agreement in KWR offices Temecula.

226.   Plaintiffs allege that each of the defendants are alter egos of the other and alter egos of the KWR.

227.   Each of the brokers acted as financial and investment advisors and are not and were not registered with the SEC or under the Advisers Act as an investment adviser and as such have not filed with the SEC.

228.   Because Vernon and Smith were not registered under applicable law, at least KWR was required to register as investment advisor both under federal and the laws of the State of California.

229.   Corporations Codes section 25009 states, in relevant part "(a) "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, publishes analyses or reports concerning securities….." - each of the defendants are

1   considered an "investment advisor" in accordance with California Corporation Code

2   section 25009(a). Plaintiff is a "client" of the defendants and KWR as defined by the

3   SEC under the rule adopted pursuant Advisers Act. The capital raising agreement

4   wherein Vernon and Smith agree to raise capital in return for a fee compensation

5   renders them as Investment advisors.

6        230.   Pursuant to California Corporations Code section 25230 (a) "It is

7   unlawful for any investment advisor to conduct business as an Investment advisor in

8   this state unless Investment Advisor has first applied for and secured from the

9   commissioner a certificate, then in effect, authorizing the Investment advisor to do

10   so….. unless advisor is subject to Section 25230.1" Defendants are not subject to

11   Section 25230.1.

12        231.   Defendants have not secured a certificate from the Corporations

13   Commissioner authorizing any of them to act as Investment Advisor in the State of

14   California.

15        232.   Plaintiffs further allege that Capital Raising contract integrated with the

16   Information Memorandum and other documents qualified as both an investment

17   contract and securities offering. Defendants failure to register as investment advisors

18   constitutes an ipso jure violation of California Corporations Code section 25110

19   because the integrated transaction at issue in this case is both an investment contract

20   and a security.

**JURY TRIAL DEMAND**

Plaintiff respectfully demands a trial by Jury for all causes of action so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor as follows:

1.      For an award of damages as to be proved against all Defendants, jointly and severally, together with interest from the time such damages were sustained;

2.      For an award of punitive and exemplary damages according to proof;

3.      For all costs of suits occurred;

4.      For all damages as the Court may deem fit;

5.      For compensatory damages: general and specific

6.      For lost profits (for breach of contract; in accordance to Mammoth Lakes Land Acquisition, LLC v Town of Mammoth Lakes (2010) 191 CA 4th 435.

7.      For an award of Attorney fees; expert fees, and any reasonable costs and expenses incurred in this action.

8.      For remedies pursuant to Sherman Act and any other remedy available at law.

Respectfully submitted,

Dated: September 20, 2016

By: _James Garrison_
James Garrison, Esq.
Attorney for Plaintiff
North American Wellness Center
Holdings, LLC

*Of Counsel*

Richard S. Gora
(*Pro Hac Forthcoming*)
Gora LLC
9 W. Broad St., Suite 550
Stamford, CT 06902

92
COMPLAINT